### State of TEXAS

v.

### Ysleta DEL SUR PUEBLO, Tigua Gaming Agency, The Tribal Council, Tribal Governor Albert Alvidrez, Tribal Lieutenant Governor Filbert Candelaria, and Gaming Commissioner Francisco Hernandez, Defendants.

### No. EP–99–CA0320–GTE.

United States District Court,
W.D. Texas,
El Paso Division.

Sept. 27, 2001.

Order Modifying Opinion May 17, 2002.

Order Denying Reconsideration of Modifying Opinion June 24, 2002.

John Cornyn, III, Attorney General State of Texas, Karen Burdett Ray, Assistant Attorney General State of Texas, Toni Hunter, Attorney General's Office, Joseph Virgil Crawford, Office of the Attorney General State of Texas, Michael T. McCaul, Office of the Attorney General, Austin, TX, Andy Taylor, Locke Liddell & Sapp LLP, Houston, TX, Julie C. Parsley, Office of the Attorney General, State of Texas, Shane Peter Phelps, Office of the Attorney General, State of Texas, Austin, TX, Bryan Gantt, McCraw & McCraw, McKinney, TX, Linda Eads, Office of the Attorney General, Melanie P. Sarwal, Office of the Attorney General, Debra A. Verbil, Senior Counsel, Austin, TX, for Plaintiff.

Norman J. Gordon, Ronald L. Jackson, Thomas M. Diamond, Diamond, Rash, Gordon & Jackson, El Paso, TX, for Defendants.

Jennifer Cook Pointer, Financial Litgationn Division Attorney General of Texas, Rande K. Herrell, Attorney General's Office, Christopher D. Livingston, Office of the Attorney General State of Texas, Austin, TX, for Intervenors.

### MEMORANDUM OPINION

EISELE, District Judge.

Before the Court are the Plaintiff State of Texas' Motion for Summary Judgment and also the Defendants' Motion for Summary Judgment. The respective parties have filed responses and replies to both motions, and, on August 22, 2001, the Court took up the motions at a hearing in open court. Finally the Court permitted the parties to file post oral argument supplemental memoranda. Both parties took advantage of the opportunity by filing their respective supplements on August 31, 2001. The Court concludes that there are no genuine issues of fact and that said motions should be disposed of in accordance with the applicable law. For the reasons stated at said hearing, as well as those set out below, the Court will grant the State's Motion and deny the Defendants' Motion.

### I. Background

The State of Texas filed this action against the Defendants on September 27, 1999, seeking to stop the operation of the Speaking Rock Casino and Entertainment Center (the "Casino") by the Ysleta del Sur Pueblo Indian Tribe (the "Tribe").[1]

---

1. The Ysleta del Sur Pueblo Tribe is also known as the Tigua Indian Tribe.

As stated in Plaintiff's motion for summary judgment the Defendants are:

> [t]he Ysleta del Sur Pueblo tribe, tribal officials, and administrative bodies of the tribe. The Tigua Indian Tribe "own[s] and operate[s]" the casino. Tab B, p. 0000806; Tab A, No. 14 (admitting same); Defs.' Resp. to Interr. No. 5 (Tab C). The Tribal Council is the tribe's traditional governing body. *See* Ysleta del Sur Pueblo Gaming Ordinance No. 001–96, at 1 (Feb. 14, 1996) (Tab D); Ysleta del Sur Pueblo Tribal Resolution No. TC–06–96 (feb. 14, 1996) (Tab E); *see also* 25 U.S.C. § 1300g(5) (recognizing Ysleta del Sur Pueblo "Tribal Council" (and its successors) as "the governing body of the tribe"); 25 U.S.C. § 1300g–3(b) (specifying that the "Tribal Council shall represent the tribe and its members in the implementation of [the Restoration Act]"). The civil and criminal law authority, indeed, "all inherent governmental power, fiscal authority, and Tribal Sovereignty," of the tribe reside with the Tribal Council. Tab E, p. 1. The tribe operates without "organic or written constitution charter, or by-laws" and "does not possess[ ] any organic documents of governance such as a constitution or By–Laws." *Id.* The Tribal Governor, Albert Alvidrez, is a member of the Tribal Council, as is the Tribal Lieutenant Governor, Filbert

Candelaria. *Id.* (listing cacique, governor, lieutenant governor, war captain, ajuacil, and four council members as the members of the Tribal council). As members of the Council, and by virtue of their positions, Alvidrez and Candelaria have certain authority over the casino's financial transactions and decisions. *See, e.g.,* tab CC, p. T–4316. The Tigua Gaming Agency supervises and regulates all gaming conducted on Tigua Lands. *See* Tab A, No. 23 (citing Gaming Ordinance No. 001–96, § 3.003); George Candelaria Aff., p. 1 (Tab F) (noting that Tigua Gaming Agency "regulates all aspects of the Tribe's gaming activities"); Tab D, §§ 2.002, 3.005–.014. The Commissioner of the Tigua Gaming Agency is Francisco Hernandez, who has supervisory authority for the tribe's gambling activities. *See* Tab A, No. 24 (citing Gaming Ordinance No. 001–96, § 3.003).

The Court accepts the Summary Judgment record cited by Plaintiff as supporting the asserted roles of the various named defendants. The Casino is located in El Paso, Texas on the Tribe's reservation land and has been operating since 1993. Although it opened as a bingo hall, the Casino has greatly expanded its gaming operation since that time and now offers a wide variety of games of chance.[2] The Court observed a video presentation pre-

---

**2.** The gambling activities include slot machines, poker, blackjack, bingo, number games, keno number games, dice games, and off-premises wagering on horse and dog races. In 1996 the Tribal council enacted Gaming Ordinance No. 001–96 which authorized gaming activities on the reservation. That ordinance has been amended. The current gaming ordinance was adopted September 28, 1999. It authorizes "any game containing the elements of prize, chance or skill, and consideration" conducted in conformity with the ordinance's provisions. *See* Tab D, § 1.004(b); Tab NN, T–6 998; and Tab D §§ 2.001(d), 4.001(a). The Council prohibited

three categories of gambling: (1) betting on the outcome of elections; (2) betting on the outcome of sports events; and (3) games conducted by use of a "video lottery machine." Tab D, § 1.005(a–c); Tab NN; T.6999. It appears that the Defendant patterned their Ordinance after the Texas Lottery Act. As noted, *infra,* they argue that the language of the Texas Lottery Act is broad enough to permit the State of Texas to engage in the same gaming activities that are engaged in by the Defendants, and that their Ordinance puts the Tribe in the same position as the State. But see discussion, *infra.*

pared by the Defendants which depicts what can best be described as a Las Vegas type casino operation. Its doors are open 24 hours a day, seven days a week. Thousands of persons who are not members of the Tribe and who do not reside on the reservation come to the Casino on frequent occasions to engage in the many gambling activities offered by the Casino. The State seeks to shut it down as a nuisance in violation of the Texas Penal Code and the Restoration Act, 25 U S.C. § 1300g–1 *et seq.* The Defendants, on the other hand, contend that all of the activities occurring within the Casino are permitted to the Tribe pursuant to the Ysleta del Sur Pueblo and Alabama Coushatta Indian Tribes of Texas Restoration Act, (the "Restoration Act" or the "Act") 25 U.S.C. § 1300g–1 *et seq.*

The Court accepts the Plaintiff's representations as to evidence supporting its Motion for Summary Judgment as set forth on pp 5–17 of its Motion for Summary Judgment and Injunction filed June 12, 2001.

The Court notes particularly the following established facts:

Any adult person aged 21 years or older who furnishes personal identification and who is not a known criminal or enemy of the tribe may participate in the gambling activities offered by the Casino.

The Ysleta del Sur Pueblo tribe realized significant financial gain and profit from the gambling activities conducted by the Casino.

The Tribe makes available gaming activities to the general public for the purposes of generating revenue for the Tribe.

The Tribe operates the Speaking Rock Casino and Entertainment Center through the Tigua Gaming Agency. The individual members of the Tribe participate in the income and earning of the enterprise through the receipt of annual payments. For the year 2000, the payment was $15,000 per member.

The casino provides in excess of 1,000 slot machines for its patrons and the tokens used to operate them must be purchased for U.S. currency and can be redeemed for cash.

In order to participate in card games and dice games customers of the casino must pay fifty cents for each game of cards or roll of the dice, resulting in a net revenue gain to the casino.

The Defendants publicly advertise the Casino and its operations in order to attract customers to participate in the gambling activities offered.

The Tribal Governor Albert Alvidrez, the Tribal Lieutenant Governor Filbert Candelaria, the Tigua Gaming Agency, and Gaming Commissioner Francisco Hernandez exercise some control and supervision over the operations and activities of the Speaking Rock Casino and Entertainment Center.

The Defendants are correct in pointing out that there is not, on the present record, any issue of inadequate regulatory oversight. With one exception the Court accepts the Defendants' statement and exhibits with respect to the Pueblo's oversight, to-wit:

Gaming on the Pueblo's reservation is governed by provisions of the Pueblo's Gaming Ordinance (Pueblo's Opposition Ex. F), which provides for regulatory oversight by an independent tribal agency, the Tigua Gaming Agency. Financial and internal controls are in place. *See* State's Supplemental Appendix, Ex. 4, Certified Audit (under seal); Ex. 6, Background Investigation Forms; Ex. 7, Vendor License; Ex. 12, Finance and Accounting Manual; Ex. 13, Cash Operations Manual; and Ex. 14, Tracking Paperwork. There has been no evi-

dence offered nor any suggestion of any type of improper or criminal activity being carried out at the Pueblo. Moreover, prior to sanitizing by the attorneys for the State, the State's expert expressed a similar opinion. In his draft report, Mr. William Holmes, a former FBI agent proffered by the State as an expert in gambling, wrote:

> The Speaking Rock Casino is a well managed casino with a compliment of dedicated employees. Their security procedures appear to be efficient and responsible. There is a separation of powers from the standpoint the Tigua Gaming Agency answers to the Tribal Council. (Pueblo's Opposition Ex. 0, Ex. 84.)

The statement was removed at the request of the Attorney General. The Attorney General's expressed concern about regulatory oversight is wrong.

See Defendants Post Oral Argument Statement, pp 2–3.

The one exception is that the Court does not agree with Defendants' statement that there is no evidence or suggestion "of any type of improper or criminal activity being carried out at the Pueblo." The Court accepts, however, that the security arrangements were, and are, good.

### A. Prior Actions

This lawsuit is not the first involving this Tribe's casino operation on its reservation land. In April of 1993, the Tribe sued the State in this federal court seeking a court order directing the State to enter into negotiations for the formulation of a Tribal–State compact, pursuant to the Indian Gaming Regulatory Act, ("IGRA"),[3] and sought a determination as to which games were the proper subject of such negotiations. See Ysleta Del Sur Pueblo v. Texas, 852 F.Supp. 587, 589 (W.D.Tex.

1993). The district court found that the State of Texas effectively permitted the types of games in which the Tribe sought to engage, and that, under IGRA, the State could, therefore, not refuse to negotiate a Tribal–State compact. The U.S. District Court required the State to enter into such a compact within 60 days of its order. Id. at 597.

The State appealed, and the United States Court of Appeals for the Fifth Circuit reversed. See Ysleta del Sur Pueblo v. Texas, 36 F.3d 1325 (5th Cir.1994) (Ysleta I). In its opinion, the Fifth Circuit determined that the Restoration Act, and not IGRA, governed the case. Id. at 1335. It then concluded that the State had not waived its Eleventh Amendment sovereign immunity from suit and accordingly reversed and remanded the case with instructions for the district court to dismiss the Tribes suit. Id. at 1335–36.

In 1998, the Tribe brought another lawsuit against the State of Texas for declaratory and injunctive relief after the State's Governor opined that the Tribe was violating the Restoration Act by its operation of the Casino. See Ysleta del Sur Pueblo v. Bush, No. P–98–CA–47. The district court concluded that the State had not waived its Eleventh Amendment immunity, and dismissed the case. The Fifth Circuit affirmed.

After this lawsuit was commenced by the State of Texas in September, 1999, the Defendants filed a motion to dismiss arguing that (1) Congress never · waived the Tribe's sovereign immunity; (2) the United State must be joined as an indispensable party; and (3) the Attorney General lacked the capacity to sue the Tribe on behalf of the State. Texas v. Ysleta Del Sur Pueblo, 79 F.Supp.2d 708, 709 (W.D.Tex.1999). The district court[4] on

---

3. IGRA is codified at 25 U.S.C. § 2701 et seq.

4. The Honorable Harry L. Hudspeth.

December 2 1999, held against the Tribe on the first two issues but found some merit in the lack of capacity argument. Nevertheless, it denied the defendant's Motion, and allowed the State to amend its Complaint thereby affording the Attorney General an opportunity to demonstrate the source of his authority to bring the suit.[5] *Id.* at 714. After the Attorney General filed an Amended Complaint, the district court, by its order of January 13, 2002, overruled another motion to dismiss, concluding that the Attorney General had the authority to bring this action. Because of the importance of both of these decisions and their relevance to many of the issues presently in the case, the Court will later herein quote therefrom at some length.

### B. Legislative History

Although the Tribe traces its roots back to Indian refugees who fled from New Mexico in the Pueblo Revolt of 1680, it was not officially recognized by the State of Texas until 1967, when its present 100–acre reservation was established. *See Texas v. Ysleta,* 79 F.Supp.2d at 709 (citing W.H. TIMMONS, EL PASO: A BORDERLANDS HISTORY, 17–24 (1990)). In 1968, the federal government first recognized the tribe, and this Court now quotes from the Fifth Circuit's very pertinent and extensive review of the history behind the Restoration Act beginning in that year:

> In 1968, the federal government recognized the Tiwa Indians of the Ysleta del Sur Pueblo as an Indian tribe but simultaneously transferred responsibility for the Indians to the state of Texas. *See* Tiwa Indians Act, Pub.L. No. 90–287, 82 Stat. 93 (1968). Although the Tiwa Indians Act constituted legal rec-

ognition of the Indians, it had no practical effect on the relationship between the federal supervision and had received no federal Indian services before the 1968 Act, and that status continue [sic] after its enactment. S.REP. NO. 90, 100th Cong., 1st Sess. 7 (1987). Instead, Texas administered the Tribe's affairs, which included holding the Tribe's 100–acre reservation in trust and providing economic development funds to the Tribe. H.R.REP. NO. 36, 100th Cong., 1st Sess. 2 (1987). Furthermore, the Tiwa Indians Act expressly recognized that the Tiwa Indians were "subject to all obligations and duties [as] citizens under the laws of the [s]tate of Texas." *See* Tiwa Indians Act.

In 1983, however, Texas became concerned that its trust relationship with the Tribe violated state constitutional law. H.R.REP. NO. 36, at 2. Consequently, the United States and the Tribe began the process of granting the Tribe federal trust status. In December 1985, the House of Representatives of the 99th Congress passed H.R.1344, a bill to restore the trust relationship between the United States and the Tribe. With regard to gaming activities, § 107 of H.R.1344 provided:

> Gaming, lottery or bingo on the tribe's reservation and on tribal lands shall only be conducted pursuant to a tribal ordinance or law approved by the Secretary of the Interior. Until amended as provided below, the tribal gaming laws, regulations and licensing requirements shall be identical to the laws and regulations of the State of Texas regarding gambling, lottery and bingo.

---

**5.** In a footnote, the district court stated that the Attorney General could characterized the Casino as a common nuisance operating in violation of the Texas Penal Code. The court went on to state that the Attorney General has the authority to bring suit to enjoin such a nuisance, *Texas v. Ysleta,* 79 F.Supp.2d at 714, n. 13. This Court agrees with Judge Hudspeth's opinion but also accepts his rulings as the "law of the case."

131 Cong.Rec. H12012 (daily ed. Dec. 16, 1985) (text of H.R.1344 as passed by the House). Notwithstanding § 107, various state officials and members of Texas' congressional delegation still were concerned that H.R.1344 did not provide adequate protection against high stakes gaming operations on the Tribe's reservation. Believing that restoration of their federal trust status was more important than exercising the option to operate gaming operations, the Tribe approved Resolution No. TC–02–86 in March 1986. The resolution represented a political accommodation between the Tribe, the state of Texas, and various members of Texas' congressional delegation. The Tribe clearly viewed the applicability of state gaming laws on its reservation as an infringement on its sovereignty. But to ensure passage of the restoration legislation, the Tribe urged Congress to adopt "language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." The distinction between the language in § 107, as passed by the House, and the Tribe's suggested language is that § 107 provided the Tribe with the option to deviate from Texas' gaming laws if the Tribe petitioned the secretary of Interior, the secretary approved, and Congress did not overrule the secretary. The Tribe's suggested language, on the other hand, established that Texas law with regard to gaming would effectively operate as surrogate federal law. The resolution also clearly indicates that the Tribe, at the time of the resolution's adoption, "ha[d] no interest in conducting high stakes bingo or other gambling operations on its reservation" and "remain[ed] firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation."

The Senate of the 99th Congress incorporated the Tribe's suggested language. Section 107 of H.R.1344, as passed by the Senate in September 1986, provided that "[g]aming, gambling, lottery or bingo as defined by the laws and administrative regulations of the State of Texas is hereby prohibited on the tribe's reservation and on tribal lands." 132 CONG.REC. S13634 (daily ed. Sept. 25, 1986)(text of H.R.1344 as passed by the Senate). Shortly thereafter, however, the Senate vitiated action on H.R.1344, see 132 CONG.REC. S13735 (daily ed. Sept. 25, 1986), whereupon the bill died.

The restoration legislation was reintroduced as H.R.318 in the 100th Congress, and the House passed the bill in April 1987. Section 107 of H.R.318 provided that, "[p]ursuant to Tribal Resolution T.C.–02–86 which was approved and certified on March 12, 1986, all gaming as defined by the laws of the State of Texas shall be prohibited on the tribal reservation and on tribal land." 133 CONG.REC. H2051 (daily ed. April 21, 1987) (text of H.R.318 as passed by the House). The Senate approved H.R.318 in July 1987. The Senate amended § 107 to read:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86 which was approved and certified on March 12, 1986.

133 CONG.REC. S10568 (daily ed. July 23, 1987) (text of H.R.318 as passed by the Senate). According to the Senate Report accompanying the legislation, the only difference between § 107 as passed by the Senate and § 107 as passed by the House was that the Senate version "expand[s] on the House version to provide that anyone who violates the federal ban on gaming contained in [§ 107] will be subject to the same civil and criminal penalties that are provided under Texas law." S.REP. NO. 90, 100th Cong., 1st Sess. 8–9 (1987). Otherwise, the report stated, the "central purpose" of the two versions was the same: "to ban gaming on the reservations as a matter of federal law." *Id.* at 8. The House concurred in the Senate's amendments in August 1987, *see* 133 CONG.REC. H6972 (daily ed. Aug. 3, 1987), whereupon H.R.318 became public law 100–89. Section 107 of the Restoration Act is now codified at 25 U.S.C. § 1300g–6.

*Ysleta I,* 36 F.3d at 1327–29 (footnotes omitted).

It may help to amplify a bit upon this legislative history. As noted in *Ysleta I,* supra, when H.R.1344 was first introduced, it did not contain a gaming provision. However, the State's Comptroller of Public Accounts objected, and, as passed by the House, the bill contained the § 107 provision which is quoted and discussed by the Fifth Circuit opinion above. However, as recounted in *Ysleta I,* the first § 107 did not allay the State's concern over the possibility of high-stakes gambling occurring on the reservation. The Texas Comptroller of Public Accounts requested that the Senate Select Committee replace § 107 with the following language:

> All forms of gaming, gambling, betting, lottery and bingo on the reservation of the tribe or on any land acquired after the date of the enactment of this title and added to the reservation or held in trust status for the tribe is hereby prohibited. For the purpose of this section, the terms "gaming", "gambling", "betting", "lottery", and "bingo" shall have the meaning given those terms under the laws and administrative regulations of the State of Texas.

*See* Defendants' Motion, Ex. C. As discussed in *Ysleta I,* the Tribe, concerned that federal trust status might not be approved amidst the gambling controversy, adopted Tribal Resolution No. T.C.–02–86 in March of 1986. At that time, the tribe was not engaged in gaming activities. The full resolution reads:

> WHEREAS, on December 16, 1985, the United States House of Representatives passed H.R.1344, a bill to provide for the restoration of the federal trust relationship to the Ysleta del Sur Pueblo (Tigua Indian Tribe of Texas), and H.R.1344 is now before the United States Senate for consideration; and,
>
> WHEREAS, after hearings on H.R.1344 before the House Committee on Interior and Insular Affairs on October 17, 1985, the Comptroller of Public Accounts for the State of Texas raised concerns that H.R.1344 would permit the Tribe to conduct high stakes gambling and bingo operations to the detriment of existing charitable bingo operations in the State of Texas; and,
>
> WHEREAS, the Comptroller urged members of the Texas Congressional Delegation to defeat H.R.1344 unless the bill was amended to provide for direct application of state laws governing gaming and bingo on the reservation; and,
>
> WHEREAS, the Ysleta del Sur Pueblo has no interest in conducting high stakes bingo or other gambling operations on its reservation, regardless of whether such activities would be governed by tribal law, state law or federal law; and,

WHEREAS, in response to the concerns voiced by the Comptroller and other officials, the Tribe attempted to insure that H.R.1344 would give the Tribe no competitive advantage in gaming operations by agreeing to amend H.R.1344 to provide that any gaming activities on the reservation would be conducted pursuant to tribal law that would be required to be identical to state law, and H.R. 1344 was so amended by the House Interior committee; and,

WHEREAS, some state officials and members of the Texas congressional delegation continue to express concern that H.R.1344, as amended, does not provide adequate protection against high stakes gaming operations on the reservation; and,

WHEREAS, the proposal that H.R.1344 be amended to make state gaming law applicable on the reservation continues to be wholly unsatisfactory to the Tribe in that it represents a substantial infringement upon the Tribes' power of self government, is inconsistent with the central purposes of restoration of the federal trust relationship, and would set a potentially dangerous precedent for other tribes who desire to operate gaming facilities and are presently resisting attempts by State to apply their law to reservation gaming activities; and,

WHEREAS, the Ysleta del Sur Pueblo remains firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation; and,

WHEREAS, although the Tribe, as a matter of principle, sees no justification for singling out the Texas Tribes for treatment different than that accorded other Tribes in this country, the Tribe strongly believes that the controversy over gaming must not be permitted to jeopardize this important legislation, the purpose of which is to ensure the Tribe's survival, protect the Tribe's ancestral homelands and provide the Tribe with additional tools to become economically and socially self-sufficient;

NOW, THEREFORE, BE IT RESOLVED, that the Ysleta del Sur Pueblo respectfully requests its representatives in the United States [Senate] and House of Representatives to amend [§ 107(a) of the Restoration Act] by striking all of that section as passed by the House of Representatives and substituting in its place language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land.

*Ysleta I,* 36 F.3d at 1328, n. 2. Both Plaintiff and Defendants emphasize the language of the resolution which shows that, while the Tribe viewed a statute restricting gaming activities on its land as an interference with its sovereignty, it nonetheless consented to such language in an effort to ensure federal trust status. The Senate therefore amended § 107 to include the provision: "Gaming, gambling, lottery or bingo as defined by the laws and administrative regulations of the State of Texas is hereby prohibited on the tribe's reservation and on tribal lands."

However, that bill died, and the issue was not taken up again until the next Congress, the 100th. When the 100th Congress took up the bill again, this time titled H.R.318, the House Committee amended § 107 to state that: "Pursuant to Tribal Regulation No. T.C.–02–86 which was approved and certified on March 12, 1986, all gaming as defined by the laws of the State of Texas shall be prohibited on the tribal reservation and on tribal lands." This bill was referred to the Senate Select Committee on Indian Affairs, which ordered H.R.318 to be reported favorably, but not before substituting a new version

of the § 107 ban. That new version, as it is now codified, reads:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the Tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86 which was approved and certified on March 12, 1986.

25 U.S.C. § 1300g–6(a). The Committee report submitted with the bill to the full Senate explained its actions regarding the gaming provisions:

> The Committee recommends an amendment in the nature of a substitute. The amendments are in response to concerns raised by the State of Texas and Senators Gramm and Bentsen of Texas. In addition, the tribes have requested amendments to the bill to remove those concerns. Staff has worked closely with the Department of Interior and with the tribes which have resulted in a number of amendments, most of which are technical, clarifying, or conforming in nature; however, three of the amendments are substantial and merit explanation. Those three substantive amendments are explained in the "Explanation of Amendments" section which follows.

> \* \* \* \* \* \*

> Sections 107 and 207 are stricken and new sections 107 and 207 are inserted. However, the central purpose of these two sections—to ban gaming on the reservations as a matter of federal law—remains unchanged. Both tribes, by formal tribal resolution, requested that this legislation incorporate their existing law and custom that forbids gambling. The Committee's amendments simply expand on the House version to provide that anyone who violates the federal ban on gaming contained in Sections 107 and 207 will be subject to the same civil and criminal penalties that are provided under Texas law. New subsection 107(b) and 207(b) were added to make it clear that Congress does not intend, by banning gaming and adopting state penalties as federal penalties, to in any way grant civil or criminal regulatory jurisdiction to the State of Texas. New subsections 107(c) and 207(c) grant to the federal courts exclusive jurisdiction over offenses committed in violation of the federal gaming ban and make it clear that the State of Texas may seek injunctive relief in federal courts to enforce the gaming ban.

> \* \* \* \* \* \*

> Section 107. This section provides that gambling, lottery or bingo as defined by the laws and administrative regulations of the State of Texas is prohibited on the tribe's reservation and on tribal lands. The provisions of Section 107 are also applicable to any lands acquired after the date of enactment of the Act and without regard to whether such lands are located within or outside of El Paso and Hudspeth Counties, Texas, if they are taken into trust by the Secretary and made part of the tribe's reservation. The prohibition contained in this section will also apply to any lands outside the reservation which might be acquired by the tribe or a member thereof and be taken into trust. With regard to tribal lands not taken into trust and therefore not made a part of the tribe's reservation, the laws and administrative regulations of the State of Texas related to gaming, gambling, lottery or bingo shall be applicable. This section also provided penalties for violations of these provi-

sions which are the same as the penalties provided by Texas law. . . .

*See* Defendants' Ex.

The Senate passed H.R.318 with the new § 107 on July 23, 1987, and the House passed the same on August 3, 1987. On the same date (August 3, 1987) Representative Morris K. Udall articulated his personal understanding of the new Senate Amendments with regard to the gaming provisions of the bill:

> H.R.318 passed the House. It was sent back from the Senate with an amendment in the nature of a substitute. The bill as amended is supported by the administration.

The Senate amendment makes changes to sections 107 and 207 of the bill. These sections deal with the regulation of gaming on the respective reservations of the two tribes. It is my understanding that the Senate amendments to these sections are in line with the rational [sic] of the recent Supreme Court decision in the case of Cabazon Band of Mission Indians versus California. This amendment in effect would codify for these tribes the Court's opinion in the case.

133 Cong.Rec. H6975 (daily ed. August 3, 1987).[6]

6. On February 25, 1987, during deliberations over the Restoration Act, the United States Supreme Court decided *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). This Court borrows from *Ysleta I's* thorough description of that case and the Congressional reaction thereto:

> In that case, two Indian tribes located in California were sponsoring unregulated gaming activities on their reservations. The state of California attempted to enforce against the tribes a state statute regulating bingo operations. The tribes sued, asserting that California had no authority to enforce its gambling laws and regulations on tribal reservations because the United States, which has plenary power over Indian affairs, had not authorized California to do so. California argued that, pursuant to Public Law 280 of 1953, the United States had expressly authorized California to enforce its bingo statute against the tribes. Public Law 280 specifically granted California authority to (1) enforce its criminal laws on Indian reservations, and (2) hear in its courts civil causes of action in which an Indian is a party. California argued in Cabazon Band that its bingo statute was a criminal law which could be enforced on Indian reservations.
>
> The Supreme Court disagreed. The Court began by noting that, while Public Law 280 broadened California's authority with regard to Indian reservations, Congress did not intend to grant it general civil regulatory authority. Public Law 280, the Court reasoned, was narrowly tailored to combat lawlessness on reservations and not "to effect total assimilation of Indian tribes into mainstream American society." *Cabazon Band*, 480 U.S. at 207–08, 107 S.Ct. at 1087. Thus, according to the Court, when a state invokes Public Law 280 to enforce its laws, it must be determined whether the law is "criminal" in nature, and therefore applicable, or "civil" in nature, and therefore inapplicable except when the law is relevant to private civil litigation in state court. The question of whether a law is criminal or civil, in turn, depends on the law's practical effect. That is, a state law is criminal, and thus applicable under Public Law 280, if it generally prohibits certain conduct, but a state law is civil, and presumptively inapplicable, if it regulates the conduct at issue. *Cabazon Band*, 480 U.S. at 209–10, 107 S.Ct. at 1088. Applying the criminal-prohibitory/civil-regulatory dichotomy, the Court rejected California's claim that its bingo statute was criminal in nature on the basis that the statute is not a general prohibition on certain conduct. Instead, "the state law generally permits the conduct at issue, subject to regulation." *Id.* at 209, 107 S.Ct. at 1088. The Court analogized California's bingo statute to the state's other gambling statutes, all of which regulate (rather than prohibit) the relevant conduct. The Court concluded that, given the extent to which the state currently regulated gambling, California had no public policy against bingo in particular or gambling in general. *Id.* at 211, 107 S.Ct. at 1089. California therefore could not prohib-

The Defendants argue that the final amendments to § 107 of H.R.318 along with Representative Udall's statements,[7] establish that the Act, as passed into law, completely eliminated the outright ban on gaming which was a part of all of its previous drafts. The Defendants contend that there is no longer a total ban on all gaming on the reservation, but, instead, there is only a ban on those "gaming activities" which are prohibited under the law of Texas.

The Defendants earlier in the history of this case urged the Court to undertake a *Cabazon*-style analysis of the statute centering on two questions of statutory interpretation: First, the meaning of the term "gaming activities," and, second, the meaning of the phrase "prohibited by the laws of the State of Texas."

However, these arguments concerning the regulatory/prohibitory dichotomy in a manner akin to *Cabazon,* have been foreclosed by the Fifth Circuit's opinion in *Ysleta I:*

> it the tribes from offering the gaming activities on their reservations.
>
> *Cabazon Band* led to an explosion in unregulated gaming on Indian reservations located in states that, like California, did not prohibit gaming. While Congress recognized that the growth in gaming generated substantial revenues for the tribes and, hence, fostered tribal autonomy, it nonetheless became concerned that unregulated growth might invite criminal elements. In 1988, Congress therefore enacted the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-21. IGRA was intended to balance the right of tribes to self-government with the need "to protect both the tribes and the gaming public from unscrupulous persons." *See generally* S.REP. NO. 446, 100th Cong., 2d Sess. 1-3 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3071-73.
>
> *Ysleta I,* 36 F.3d at 1329-30 (footnotes omitted).

7. At oral argument, Defendants contended that, even if the Court is unpersuaded that

The Tribe insists that, under either IGRA or the Restoration Act, the analysis for determining whether the Tribe's proposed gaming activities are allowed is the same. Specifically, it insists that § 107(a) of the Restoration Act does not operate as an independent bar to its proposed gaming activities because Texas does not "prohibit" the proposed gaming activities. The first sentence of § 107(a) of the Restoration Act provides: "All gaming activities which are prohibited by the laws of the State of Texas are prohibited on the reservation and on lands of the tribe." 25 U.S.C. § 1300g-6. The Tribe maintains that the term "prohibit" has special significance in federal Indian law, which is derived from *Cabazon Band,* and whether a federal court is interpreting IGRA or the Restoration Act, it should apply the same analysis, i.e., the *Cabazon Band* criminal-prohibitory/civil-regulatory dichotomy. Thus, according to the Tribe, the critical question under either IGRA or

Representative Udall's statement is an accurate reflection of what change in the law was intended by Congress to accomplish, it is certainly evidence that a change occurred, whatever its purpose. The Court agrees. It is true that the Senate Committee reports indicate that no substantive change was intended and Ysleta I appears to agree with that conclusion. However, both parties now agree that the change was substantive, as both agree that the ban in the enacted version of the Restoration Act is not absolute, something the Senate Committee report did not mention when it described Section 107 as banning "gambling, lottery, or bingo as defined by the laws and administrative regulations of the State of Texas." *See Supra.* Whether or not the parties and this court now agree that the Amendment constituted a significant change, the question remains: Did the Fifth Circuit in Ysleta I agree, or did it view the final change in the wording of Section 7(a) as making no change in the intent or effect of the section? See discussion, *infra.*

the Restoration Act is whether Texas law and public policy "prohibit" (that is, criminalize rather than regulate) the proposed gaming activities.

The Tribe argues that Texas does not prohibit the Tribe's proposed gaming activities by pointing to the State's broad definition of a lottery: " 'Lottery' means the procedures operated by the state under this chapter through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize." TEX.GOV'T.CODE ANN. § 466.002(3) (Vernon Supp.1994). The Tribe contends that its proposed gaming activities fall within the State's definition of lottery. That is, like a lottery, the Tribe's proposed gaming activities (i.e., baccarat, blackjack, craps, roulette and slot machines) are all games of prize, chance and consideration. Because the State permits one type of game where the elements are prize, chance and consideration, the State no longer prohibits any other games with the same elements. The State, instead, merely regulates them. Consequently, according to the Tribe, § 107(a) of the Restoration Act does not act as an independent bar to the Tribe's proposed gaming activities.

The Tribe's argument is appealing only because § 107(a) of the Restoration Act uses the word "prohibit." But our analysis of the legislative history of both the Restoration Act and IGRA leads us to a conclusion contrary to that sought by the Tribe. When it passed IGRA, Congress indicated that, when determining whether Class III games are "prohibited" in certain states, federal courts should rely on *Cabazon Band's* criminal-prohibitory/civil-regulatory distinction. No such express recognition of *Cabazon Band* appears in the committee reports accompanying the Restoration Act. Rather, in considering the Restoration Act, Congress clearly was concerned with enacting the compromise between the Tribe, the State and various members of the Texas congressional delegation. Congress specifically drafted § 107(a) "in accordance with the tribe's request in tribal Resolution No. T.C.–02–86." 25 U.S.C. 1300g–6(a). That resolution is crystal clear. The Tribe, in response to the concerns of Texas officials and various members of the State's congressional delegation, petitioned Congress to adopt "language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." Congress acquiesced, and in so doing, spelled out the purpose of § 107(a): "[t]his section provides that gambling, lottery or bingo *as defined by the laws and administrative regulations of the State of Texas is prohibited on the tribe's reservation and on tribal lands.*" S.REP. NO. 90 at 10 (emphasis added). The report's reference to both the laws *and* administrative regulations of Texas is clearly inconsistent with a contention that the Tribe and Congress contemplated that the prohibitory-regulatory distinction of *Cabazon Band* would be involved in analyzing the Restoration Act. Furthermore, as a means of enforcing those laws and regulations, Congress provided in § 107(a) that "[a]ny violation of the prohibition provided in this subsection shall be subject to the *same civil and criminal penalties that are provided by the laws of the State of Texas.*" 25 U.S.C. § 1300g–6(a) (emphasis added). Again, if Congress intended for the *Cabazon Band* analysis to control, why would it provide that one who violates a certain gaming prohibition is subject to a *civil* penalty? We thus conclude that Congress did not enact the Restoration

Act with an eye towards *Cabazon Band*. Congress was merely acceding to the Tribe's request that the tribal resolution be codified. See S.REP. NO. 90 at 8 (the Tribe, "by formal resolution, requested that this legislation incorporate [its] existing law and custom that forbids gambling").

The Tribe points to two items in the Restoration Act's legislative history that it believes indicates Congress incorporated *Cabazon Band* into § 107(a) of the Act. First, Congress noted in its report that § 107(b) "is a restatement of the law as provided in [Public Law 280]." *Id.* at 10. The reference to Public Law 280, the statute at issue in *Cabazon Band*, presumably is the hook on which the Tribe hangs this argument. The Tribe's argument, however, misses the mark, because § 107(b), as opposed to § 107(a), states only that the Restoration Act is not to be construed as a grant of civil or criminal regulatory jurisdiction to the State. In that sense *only*, § 107(b) is a restatement of Public Law 280. But it is § 107(a) that determines whether Texas "prohibits" certain gaming activities, and § 107(a) is not a restatement of Public Law 280.

The Tribe's second argument admittedly raises a closer question. In August 1987, as the Restoration Act was on the brink of final passage in the House of Representatives, a member made the following statement on the floor of the House:

It is my understanding that the Senate amendments to [§ 107] are in line with the rational [sic] of the recent Supreme Court decision in the case of Cabazon Band of Mission Indians versus California. This amendment in effect would codify for [the Tribe] the holding and rational [sic] adopted in the Court's opinion in the case.

133 CONG.REC. H6975 (daily ed. Aug. 3, 1987) (statement of Rep. Udall).

Standing alone, this statement supports the Tribe's argument that Congress intended to incorporate *Cabazon Band* into the Restoration Act. But we find ourselves confronted with substantial legislative history to the contrary, including the plain language of § 107(a), its accompanying report language, and the tribal resolution to which § 107(a) expressly refers. We cannot set aside this wealth of legislative history simply to give meaning to the floor statement of just one representative that was recited at the twelfth hour of the bill's consideration. *See, e.g., Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 648–50, 110 S.Ct. 2043, 2047–48, 109 L.Ed.2d 659 (1990). Rather, upon reviewing these materials, we are left with the unmistakable conclusion that Congress—and the Tribe—intended for Texas' gaming laws and regulations to operate as surrogate federal law on the Tribe's reservation in Texas.

\*　　\*　　\*　　\*　　\*　　\*

The Tribe warns that our conclusion (i.e., that Texas gambling laws and regulations are surrogate federal law) will constitute a substantial threat to its sovereignty in that "[e]very time the State modifies its gambling laws, the impact will be felt on the reservation." However, any threat to tribal sovereignty is of the Tribe's own making. The Tribe noted in its resolution that it viewed § 107(a) of the Restoration Act as "a substantial infringement upon the Tribe's [sic] power of self government" but nonetheless concluded that relinquishment of that power was necessary to secure passage of the Act. To borrow IGRA terminology, the Tribe has already made its "compact" with the state of Texas, and the Restoration Act embodies that compact. If the Ysleta del Sur Pueblo wishes to vitiate the compact

it made to secure passage of the Restoration Act, it will have to petition Congress to amend or repeal the Restoration Act rather than merely comply with the procedures of IGRA.

*Ysleta I*, 36 F.3d at 1332–34, 1335.[8]

The State, likewise, does not in this proceeding urge the Court to read *Ysleta I* as interpreting the Restoration Act to be a complete ban on all gaming on the Reservation. Note the following language from Motion for Summary Judgment:

> Additionally, the State does not, as the tribe contends, bottom its case on a view that the Restoration Act bans all gaming. The plain language of the Restoration Act is the beginning and the end of the State's theory: "All gaming activities which are prohibited by the laws of Texas are prohibited on the reservation and on lands of the tribe." 25 U.S.C.

§ 1300g–6(a). If the tribe qualifies for a gambling activity not prohibited to it by Texas law, then, of course the tribe may pursue that activity within the confines and limits of the law. At this point, however, it is undisputed that the tribe is not running nonprofit or charity gaming, it is not the State of Texas, its prizes are cash that far exceed $5 or $25, the tribe lacks a license from the Texas Racing Commission, and it is a commercial casino operator, generating millions in annual revenues. *See* Plaintiff's Reply to Defendants' Response to Motion for Summary Judgment, p. 2.

So the State and Defendants agree that only gaming which is prohibited by Texas law is prohibited to the Tribe.[9]

The State urges the Court to accept a reading of the Restoration Act which would treat the Tribe as any other citizen

---

**8.** It is not so clear to the Court how far the Fifth Circuit interpreted the Restoration Act's ban on gaming to stretch. *Ysleta I* certainly found that the Act's Section 107 was a codification of the Tribe's resolution and promise as recorded in T–C–02–86. That promise made the ban absolute, regardless of the legality of the practice in Texas: "all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." *See Ysleta I*, 36 F.3d at 1328. However, the Fifth Circuit also seemed to recognize the possibility that the scope of the ban might change with alterations in Texas law; when it recognized the Tribe's warning that, " '[e]very time the State modifies its gambling laws, the impact will be felt on the reservation.' " *Id.* at 1335. Arguably Texas could change its *definitions* of "gaming, gambling, lottery or bingo," or it could change the gaming or gambling activities it chose to *prohibit*. Ysleta I leaves this an open question.

**9.** Note the following statement of counsel for the State during the August 22, 2001, oral arguments:

> MR. CRAWFORD (For the State of Texas): So what the change in the language for the Restoration Act did, if anything, from being

defined by the laws of the State of Texas to being prohibited by Texas, it would actually give the tribe the ability to engage in charitable raffling or charitable bingo or any of the things that other people can if they met the criteria set out under Texas statutes. So, under that reading, which we argue is the correct reading, they're treated no differently than any other citizen of the State of Texas, no different from Julie Parsley or Joe Crawford or anyone else who wanted to go out and operate a slot machine or keno table or whatever it was that we were going to be doing, we are prohibited by law from doing it, and the tribe is prohibited by law from doing it.

Tr. Hearing on Summary Judgment Motions, Pages 36–37.

The "as defined" versus "which are prohibited" difference could have been significant because if Texas law "defined" certain gaming or gambling activities but the legalized same (i.e., did not "prohibit" such activities) then the prior version of § 107(a) would have prevented the Tribe from engaging in such activities on its reservation even though everyone else in Texas could engage in those activities. However, under Texas Law as presently written, interpreted and applied, the differences in terminology do not affect the outcome. *See, infra.*

of Texas. What a citizen of Texas can do, the Tribe can do. But what a citizen of Texas cannot do, the Tribe cannot do. The State argues that when the Restoration Act was passed, it waived any sovereign status claim the Tribe might have regarding gaming, with the full knowledge and consent of the Tribe. The State contends that during the passage of the Restoration Act, the Tribe through its Resolution, agreed to be subjected to the gaming laws of Texas just as any other citizen in exchange for federal trust status.

The Tribe argues that it is not just any other citizen, but a sovereign nation, and the Restoration Act did not change that status, even with regard to gaming.

The Defendants agree that *Ysleta I* makes clear that Congress did not enact the Restoration Act with an eye towards *Cabazon*.[10] However, they argue that the court did not delineate the scope of the Restoration Act's prohibition on gaming in its decision. In addition, the Defendants contend that nothing said by the Circuit Court panel regarding the Restoration Act's gaming clause has a preclusive effect on this Court's decision, as the discussion was not necessary to support its decision and is therefore merely dicta.

As for the Defendant's first argument, the Court disagrees that *Ysleta I* did not delineate the Restoration Act's prohibition on gaming. What it did not do, as the Defendant's had sought (and seek again here), was to engage in a game by game analysis of what is, and is not, prohibited under Texas law. The Fifth Circuit did not do that because it determined that the Restoration Act's prohibition was drafted specifically in accordance with the Tribe's wishes as detailed in Tribal Resolution No. T.C.–02–86, and that that resolution petitioned Congress to adopt language which would prohibit "*all* gaming, gambling, lottery, or bingo as defined by the laws and administrative regulations of the State of Texas...." *See Ysleta I*, 36 F.3d at 1333 (emphasis added). *Ysleta I* appears to have determined that § 107, as enacted, and properly interpreted, bans all gaming. Therefore, contrary to the Defendants' as-

---

**10.** Although the Defendants disclaim reliance on the *Cabazon* rationale, their arguments in this case relating to the interpretation of the word "prohibit" clearly echo the same or similar theory. Their plea for a strange and unnatural interpretation of the language of the Restoration Act ultimately is justified on the basis of the Pueblo's unusual status as a "sovereign" Indian Tribe. The Tribe simply wants to be treated differently from others. But the State says that the Tribe gave up the right to be treated differently from others when it gave up any sovereign immunity it may have possessed with respect to gaming and gambling in exchange for federal trust status. And, as pointed out by the State at page 4 of its Reply in Support of its Motion for Summary Judgment, this particular limitation on the Tribe's sovereignty is not inconsistent with other federal laws dealing with similar issues:

> It also bears emphasis that the tribe's urged meaning for the Restoration Act makes no sense in the context of other statutes, addressing tribal gambling. With 18 U.S.C.

§ 1166, Congress criminalized all gambling on reservations that is against state law and not permitted under the IGRA. Through the Johnson Act, 15 U.S.C. § 1175, it outlawed the manufacture, possession, or use of gambling devices, and in the Organized Crime Control Act, 18 U.S.C. § 1955, it prohibited for profit gambling businesses that are illegal under the state law. With the IGRA, Congress established a detailed scheme of oversight and coordination with state governments to permit gambling on some Indian reservations. *See* 25 U.S.C. § 2701 *et seq;* 25 C.F.R. § 500 *et seq.* The tribe's interpretation of "prohibited" is not in keeping with these strict limitations, oversight, and criminalization in the field of Indian gaming. It defies common sense to believe that this particular tribe may operate with no controls or limitations, while other tribes are governed by the limitations and procedures of the IGRA and the regulations of its implementing agency, the National Indian Gaming Commission.

sertion, it can be argued that the scope of the Act's prohibition as articulated in Ysleta I was to encompass *all gaming activity* as "defined" by the laws and regulations of the State of Texas, whether "prohibited" or not. This interpretation would be consistent with the Senate Report explaining the "substantive" changes occasioned by the amendatory language and also with the language in Ysleta I just quoted above.

Likewise, the Court disagrees with the Defendants' contention that *Ysleta I's* lengthy discussion of the Restoration Act's ban on gaming was merely dicta. The question before the court was: Which statutory scheme, IGRA or the Restoration Act, governed the Tribe's casino operation? And, to resolve that question, the Fifth Circuit had to first determine the effect of the Restoration Act's § 107. Only after determining § 107's effect could it then decide whether the Restoration Act and IGRA had an actual conflict. Once the court found conflict, it was forced to decide which statute to apply, and, in so doing, concluded that the Restoration Act, as the specific statute, was applicable. *See Ysleta I*, 36 F.3d at 1332–33. Only after it decided that the Restoration Act applied could the court decide whether the Act had waived the State's sovereign immunity. If the court had determined that IGRA applied, or that the Restoration Act and IGRA followed the same basic statutory scheme regarding gaming, the result of the case would have been different. So the initial determination regarding the breadth of the Restoration Act's provisions on gaming was a necessary step toward the Court's final decision. And that determination being necessary, it cannot be dicta. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that "it is not only the result but also those portions of the opinion necessary to that result by which we are bound").

Further, this Court agrees, as held in *Ysleta I*, that the Restoration Act, and not IGRA, controls the outcome of this case.[11]

Defendants have conceded that if the final change in the wording of § 107 had not been made, i.e., if § 107 as enacted contained the earlier language, to-wit: "Gaming, gambling, lottery or bingo as defined by the laws and regulations of the State of Texas is hereby prohibited on the Tribe's reservation and on tribal lands," then, and in that event, they cannot prevail. However, both of the parties, and this Court, agree that the amendatory language did significantly, if not substantially, change the statute, although this Court is

---

**11.** However, IGRA's presence in general Indian Law, and the Fifth Circuit's analysis of the Restoration Act, further undermines the Defendant's position. For the only way for the Defendants to fully win, *i.e.*, to be permitted to maintain and operate its Casino as it presently does, is for this Court to find in the Restoration Act a specific *grant* of gaming privileges to the Tribe and that said grant trumps the IGRA provisions regarding Class III gaming. Stated otherwise, it would not be enough for the Court to conclude only that the Restoration Act does not bar the Tribe's gaming activities. The Court would also have to conclude that, because of the Restoration Act, the provisions of IGRA cannot be enforced against the Tribe.

To illustrate, one need only ask what if *no* gaming provision had been included in the Restoration Act? Then, most assuredly, IGRA would apply. In *Ysleta I*, the Fifth Circuit concluded that the specific statute (the Restoration Act) controlled over the general(IGRA) on the gaming issue. So, if there were no specific statute, then IGRA would provide the only means by which the Tribe could operate its Casino, i.e., through IGRA's tribal-state IGRA's tribal-state compact provisions. Even if the Court agreed that *Ysleta I* did not delineate the scope of § 107's ban, or that it only discussed § 107 in dicta, it cannot reasonably be argued that the Fifth Circuit read § 107 as a grant of gaming authority to the Tribe. See discussion below.

convinced, as the legislative history and *Ysleta I* strongly indicates, that Congress did not intend any change. This Court's own view of proper statutory construction does not permit reliance upon legislative history to change the meaning of the language used in the statute, where the language used is clear and unambiguous, as it is in § 107 as enacted. But the question is: does the Fifth Circuit's opinion adopt a different view of statutory construction thereby concluding that all gaming as defined by Texas law is prohibited on the reservation. If so, we should stop here. The court acknowledges its uncertainty as to the correct resolution of this issue. Prudence indicates, therefore, that it should go forward.

So, assuming that *Ysleta I* does not foreclose such analysis, the Court will now deal with the remaining issues as presently argued by the parties.

### Applicability of the Texas Penal Code to the Pueblo

■ The Defendants contend that the Texas Penal Code by its own terminology does not apply to it. They argue that the Tribe is not a "person" under Code definitions but, rather, a "dependent sovereign nation." Section 1.07(38) of that Code defines "person" as an "individual, corporation or association." Section 1.07(6) defines an "association" as "government or governmental subdivision or agency, trust, partnership or two or more persons having a joint or common economic interest." The Tribe as a group of "two or more persons" clearly has a "joint and common economic interest" under the facts of this case. The Tribe is engaged in the casino gambling enterprise for profit, receiving millions of dollars in revenues each year. This interpretation of "association" is reinforced by § 1.05 of the Penal Code which provides that "the rule that a penal statute is to be strictly construed does not apply to this Code. The provisions of this Code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the statute." Courts and the United States Congress have frequently referred to tribes as "associations." *See, e.g., Blue Legs v. U.S.B.I.A.*, 867 F.2d 1094 (8th Cir.1989) wherein it is stated that "over the course of the last two centuries Indian tribes have evolved into dependant associations with limited powers of self-government." It is clear to the Court from a reading of the Texas Penal Code that it intended to embrace within the term "person" any entity that was capable of violating the provisions of that Code. The Court further agrees with the State that while the Code's definition of the word "person" is clear, as just indicated, it is also inconsequential since the Restoration Act itself imposes state law as surrogate federal law on the Defendant Tribe as a matter of law.

■ The Defendants need to understand also that the Restoration Act's prohibition reaches beyond the Tribe and the other named Defendants. It states that "all gaming activities which are prohibited by the laws of the State of Texas are prohibited *on the reservation and on lands of the Tribe.*" That language covers *all persons* who patronize the casino and engage in its gambling activities as well as the Defendants who own the facilities and administer, manage and regulate the casino's gambling activities. And, of course, the patrons are "persons" within the meaning of the Penal Code. Finally, this being a civil action to enforce civil remedies under the Restoration Act, the Court is not limited by the definitions in the Penal Code. So the next question is: do the provisions of the Texas Penal Code prohibit the gambling activities that are being conducted by the Defendants on the Tribe's reservation land?

The State would answer, "yes" because it believes that the effect of the Restora-

tion Act is to treat the Tribe as any other citizen of Texas. Again, what a citizen of Texas can do, the Tribe can do. But what a citizen of Texas cannot do, the Tribe cannot do.

The Tribe, while it agrees Texas law would not permit any Texas citizen to do what its casino is doing, nevertheless, contends that it is not just any other citizen but, rather, a sovereign nation, and that this prevents it from being treated as any other citizen of Texas under the provisions of the Restoration Act.[12] Rather, it argues that it should be treated as the State of Texas is treated. And it points to the language of § 107(a) which states that "all gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation ..." It argues that the laws of the State of Texas, particularly the Lottery Law, are broad enough to permit the State of Texas to engage in any and all of the gaming activities that are presently conducted by the Tribe. Here the Defendants contend that if the State of Texas itself is not prohibited under its own constitution and its own state laws from engaging in the gaming and gambling activities of the type engaged in by the Pueblo on its reservation then the Pueblo is not prohibited from engaging in those gaming and gambling activities, and that this would be so whether or not the State actually chooses to engage in such gaming activities.

The problem for the Defendants is that, as *Ysleta I* makes clear, the Tribe waived any parallel sovereign status claim that it might have regarding gaming when it made its "compact" with the State in order to obtain federal trust status.[13]

**12.** Again, note the colloquy between the court and the Defendants' attorney during the Court's first conference on the case in July 2001:

> THE COURT: Are you contending that the language of the State Lottery Act would permit a citizen, any citizen in the State of Texas, on their own lands to conduct an operation such as you are conducting because of the breadth of its language?
> MR. GORDON: No, sir. We are contending the State lottery Act allows the State of Texas to conduct any activities, including any activities a tribe may be operating at its casino under the lottery act. And we are contending that those activities are, by virtue of the constitutional amendment and the lottery act, permitted to the State of Texas.
> THE COURT: Since they are permitted to the State of Texas, then how does that work that they are permitted to the Tribe?
> MR. GORDON: It opens up the whole gamut of gaming to the state. We believe its permitted to the state, it is permitted to the tribe.
> THE COURT: In other words, your focus is on the state's rights. In other words, if the state has the authority to do it, then it's in your view not, quote, prohibited, unquote.
> MR. GORDON: Yes. That is certainly true.

To the same effect note the Defendants' statement at page 2 of its Opposition to Plaintiff's Motion for Summary Judgment:

> "The State's entire approach and argument relies on the misplaced assumption that the Pueblo, a dependent political community, possessing attributes of sovereignty, is no different than a corporation or fraternal association. Proper recognition of the nature and status of the Pueblo requires denial of the State's Motion."

But the State does not deny that the Pueblo as an Indian Tribe possesses certain attributes of sovereignty. What it does deny is that the Pueblo possesses any attribute of sovereignty *with respect to gaming and gambling activities*. As stated by Judge Hudspeth in his December 2, 1999, order, "The court finds that § 1300g–6 [of the Restoration Act] does represent an unequivocal waiver of tribal immunity, and governs the sovereign immunity issue in this case." *See* p. 5 of opinion. So the State is right in its contention that, with regard to gaming activities, the Pueblo must be treated the same as any person, corporation or association.

**13.** The Tribe disavowed in its resolution, quoted *supra*, any interest in conducting any gambling operations on its reservation and stated its "commitment to prohibit outright

And the Defendants are confronted by another insurmountable barrier because the Court concludes that the State cannot, under existing Texas law, lawfully engage in the gaming and gambling activities as they are conducted by the Tribe at the Speaking Rock Casino on its reservation. But, the Court goes further and concludes, as a matter of law, that even if the State's constitution and statutes did permit it, and it alone, to engage in such activities, thereby prohibiting it to others, then the Defendant Tribe, as one of those "others" could not lawfully engage in such gaming and gambling activities. The Tribe simply does not, as regards gambling, share a parallel sovereign status with the State of Texas. The laws may permit the State to engage in certain gaming activities without thereby opening the door for the Tribe or any other person to engage in such activities.

The Court concludes, as a matter of law, that the fact that the State of Texas is authorized to conduct a lottery does not in any way open the door for the Defendants to engage in such a lottery or any other gaming activities.

There are certain gambling activities that private citizens and/or certain organizations, such as charities, may engage in lawfully in Texas if they comply with those State rules, regulations, and licensing requirements that pertain to such gambling activities. The State has acknowledged that the Tribe, if it qualified under such rules and regulations and, if it complied with those established rules and regulations, could participate in such limited gaming activities. The problem here is that the Defendant Tribe has not even attempted to qualify under the rules, regulations or licensing requirements of the State of Texas with respect to any of the gaming activities presently being conducted at the casino on its Reservation. And,

since the *Cabazon* criminal and prohibitory civil-regulatory distinction does not apply under the Restoration Act with respect to gambling, the Tribe cannot engage in these "regulated" gaming activities unless it complies with the pertinent regulations.

The Court, having found and concluded that the Texas Penal code applies to the Tribe and the other Defendants, it must now determine if the summary judgment record supports the State's position that the Tribe has been, and is, violating the specific provisions of that code. The answer is a clear "Yes." Indeed, as noted above, it does not appear that the Defendants would argue that if a person, partnership, corporation or association (other than the Tribe itself) engaged in the gaming and gambling activities as they are presently engaged in by the Tribe on its reservation, then such person, partnership, corporation, or association would be in violation of the provisions of the Penal Code. But, whether the Defendants would agree or not, the Court concludes that Defendants are operating the casino, or causing it to be operated, in violation of the Penal Code as follows.

The Court finds that the Tribe operates, *inter alia*, high-stakes bingo, keno games, a form of blackjack called Tigua 21, poker games, slot machines, crap games, a "Big-Six" wheel game, and off-track betting on horse and dog races, all as described in the State's Motion for Summary judgment under the heading "games at the Casino." Pp 10–17. And the Court notes that the summary judgment record cited therein fully supports this finding.

And the Court makes the following additional conclusions of law:

The Speaking Rock Casino and Entertainment Center is a building which has as one of its uses, the making or settling of

any gambling or bingo in any form on its reservation."

bets, as defined by Section 47.01(3) of the Texas Penal code.

The Speaking Rock Casino and Entertainment Center is a place where, among other activities, one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value, as defined by Section 47.01(7) of the Texas Penal Code.

The Speaking Rock Casino and Entertainment Center is a place where activities are conducted which include one or more of the activities described in Section 47.02(a), 47.03(a), 47.04(a), 47.05(a) and 47.06(a) of the Texas Penal Code.

The Defendants knowingly maintain the Speaking Rock Casino as a place where persons repeatedly and habitually go for purposes of gambling and that these activities are frequent and continuous.

The Defendants habitually make the Speaking Rock Casino available to members of the general public for gambling, gambling promotion and the communication of gambling information, all of which are prohibited by law.

The Defendants operate the Speaking Rock Casino as a place where plays and bets are made upon games played with cards, dice and other gambling devises.

The Speaking Rock Casino is not a "private place" as defined by Texas Penal Code § 47.01(8), but rather is a public place to which the general public is invited and has ready access.

### Remedy

So what is the appropriate remedy? Here it will be helpful to quote from Judge Hudspeth's decisions of December 3, 1999, and his follow-up opinion of January 13, 2000. First the pertinent part of Judge Hudspeth's opinion of December 3, 1999, dealing with the Defendant's Motion to Dismiss:

This is the case that asks the question: can the State of Texas enjoin gambling activities taking place on an Indian reservation located within its borders? (Fn.1)

---

(Fn.1) Certain forms of gambling are prohibited in Texas. *See* Tex.Pen.Code Ann. § 47.01 et seq.; *see also* Tex const. Art. 3 § 47(a) (directing state legislature to pass anti-gaming laws).

\* \* \* \* \* \*

The Restoration Act purported to prohibit gambling on the reservation by incorporating state law; however, the Tribe tried to compel Texas to negotiate a "Tribal–State compact" pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* (1987). *See Ysleta Del Sur Pueblo v. State of Texas*, 852 F.Supp. 587, 588–89 (W.D.Tex.1993). The Tribe hoped that an IGRA compact would result in federal authorization of reservation gambling. The Fifth Circuit Court of Appeals ultimately resolved the question in favor of the State of Texas by holding that the Restoration Act, as opposed to IGRA, would govern the gambling question were a proper suit to arise. *See Ysleta I*, 36 F.3d at 1335–36.

\* \* \* \* \* \*

Having also determined that activities at Speaking Rock were in violation of the Restoration Act, the AG commenced the instant lawsuit. In their motion to dismiss, Defendants raise the following claims: (1) Congress never waived the Tribe's sovereign immunity, (2) the United States must be joined as an indispensable party before the AG can proceed, and (3) the AG lacks capacity to sue the Tribe on behalf of the State of Texas.

## C. Waiver of Sovereign Immunity

Defendants first argue that nothing in the Restoration Act constitutes a waiver of the Tribe's sovereign immunity. Alternatively, Defendants argue that the question of whether Plaintiff can bring suit should be governed by Public Law 280. (Fn.2)

(Fn.2) Public Law 280 is codified at 18, U.S.C. § 1162(a) and 28 U.S.C. § 1360(a). *See* Pub.L. No. 83–280, §§ 2, 4, 67 Stat. 588, 588–89 (1953). Under Defendants' theory, some of the language of Public Law 280 mirrors provisions of the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1301 *et seq.* (1968), even though the former statute applies only to certain tribes outside of Texas. Compare 28 U.S.C. § 1360 and 18 U.S.C. § 1162 with 25 U.S.C. §§ 1321–22. By contrast, ICRA applies to all federally-recognized tribes. *See* 25 U.S.C. § 1301. Hence, Defendants argue, Public Law 280 jurisprudence should apply to tribes in Texas through ICRA.

\* \* \* \* \* \*

The Restoration Act provides that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe." *See* 25 U.S.C. § 1300g–6(a). All civil and criminal penalties relating to illegal gambling under state law apply on the reservation, and Congress granted exclusive jurisdiction to federal courts over actions involving gaming violations on the reservation. *See* 25 U.S.C. § 1300g–6(a–c). Most importantly, the Restoration Act allows the State of Texas to bring suit in federal court to enjoin any such violations. *See Id.*

The court finds that § 1300g–6 does represent an unequivocal waiver of tribal immunity, and governs the sovereign immunity issue in this case.

\* \* \* \* \* \*

In addition, the Court finds that Defendants' argument regarding Public Law 280 and the ICRA fails since Congress clearly intended to abrogate the Tribe's immunity for purposes of prohibiting gambling. The Restoration Act is an act related to specific tribes, and was passed almost twenty years after ICRA.

\* \* \* \* \* \*

In addition, Public Law 280 does not apply to Texas tribes. More importantly, the Fifth Circuit Court of Appeals has made it clear that the analysis of gambling on the Tribe's reservation is to be governed exclusively by the Restoration Act. *See Ysleta I,* 36 F.3d 1325, 1332–35 (5th Cir.1994) ("the Restoration Act ... and not IGRA would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law.") Moreover, the Fifth Circuit implicitly repudiated Public Law 280 jurisprudence in *Ysleta I.* (Fn.4)

(Fn.4) The lower court determined that IGRA directed courts to adopt the analytical framework of the Supreme Court's ruling in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) in assessing reservation gambling questions. *See Ysleta Del Sur Pueblo,* 852 F.Supp. at 593. *Cabazon* was a Public Law 280 case. Thus, by finding that the Restoration Act, and not IGRA, governed a dispute involving the Tribe, it implicitly rejected the *"Cabazon*/Public Law 280" framework. *See Ysleta I,* 36 F.3d at 1335.

Furthermore, tribal immunity is not a defense to a claim for injunctive relief when brought against tribal officials and the Tribe itself. *See TTEA v. Ysleta del Sur Pueblo,* 181 F.3d 676, 680–681 (5th Cir.1999); (Fn.5)

(Fn.5) The suit in *TTEA* was brought against the Tribe, two tribal judges, and the Tribal Court.

*See also Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677. Thus, Plaintiff has established a prima facie basis to proceed.

\* \* \* \* \* \*

### D. Capacity to Sue

\* \* \* \* \* \*

In this case, the AG has cited no statute empowering him to sue the Defendants on behalf of the State of Texas, nor is any grant of authority found in the Texas Penal Code. (Fn.12)

> (Fn.12) *See* Tex.Pen.Code Ann. § 47.01 *et seq.; see also Lone Starr Multi Theatres, Inc. v. State*, 922 S.W.2d 295, 298 (Tex.App.—Austin, 1996, no writ) (noting that authority to enforce Penal Code is vested exclusively in district any county attorneys, and that AG cannot initiate prosecutions.)

The AG's claim of authorization through this common law power must be rejected in light of the proceeding discussion. Although the AG attempts to characterize § 1300g–6(c) of the restoration Act as providing him with authority to sue, such a reading would in effect transform congress into the Texas legislature.

\* \* \* \* \* \*

The burden of proof rests with the AG to identify a source of power authorizing him to exercise this option on behalf of the state. Thus far, the AG has not met his burden.

Nonetheless, given the competing policy interests in this case, and in light of the fact that dismissal is generally disfavored under the federal Rules, the court will afford the AG an opportunity to amend his complaint to properly demonstrate his source of authority, under Texas law, to bring this suit. (Fn.13)

> (Fn.13) Arguably, the AG could characterize Speaking Rock as a "common nuisance" since it appears to be "a place to which persons habitually go for the purpose of ... gambling in violation of the Texas penal code." *See* Tex.Div.Prac. & Rem. code § 125.001. The AG has authority to bring suit to abate or enjoin such a nuisance. *See Id.* § 125.002 On their face, these statutes appear to confer the necessary authority.

Thereafter on January 13, 2000, Judge Hudspeth entered his order denying De-

fendants' second motion to dismiss, the pertinent part of which we now quote:

> On December 16, 1999, the AG filed a first amended complaint alleging capacity to bring suit in the name of the State of Texas to enjoin and abate a public nuisance. *See* Tex.Civ.Prac. & Rem. Code Ann. §§ 125.001–002 (Vernon's 1997) ("Civil Practice Code"). (Fn.1)

> Fn. 1: the statutes allow the AG to enjoin several public nuisances, including the "use of any place for ... (1) gambling, gambling promotion, or communicating gambling information prohibited by law[.]" *See* Tex.Civ. Prac. & Rem.Code Ann. § 125.021.

### A. Application of State Law Under Restoration Act

Defendants request dismissal of this case for lack of subject matter jurisdiction or failure to state a claim on the basis that sections 125.001 and 125.002 of the civil Practice Code form part of a state regulatory scheme. Under section 107(b) of the Restoration Act, the State of Texas has no general civil or regulatory jurisdiction over the reservation; therefore, Defendants argue, the state public nuisance laws cannot apply on their reservation.

A brief review of the statutory scheme illustrates the flaw in Defendants' reasoning. Section 107(a) of the Restoration Act provides that all gambling activities prohibited under Texas law are also prohibited on the reservation. *See* 25 U.S.C. § 1300g–6(a). Thus any state gambling law becomes federal law for purposes of reservation gambling. *See Ysleta del Sur Pueblo v. State of Texas*, 36 F.3d 1325, 1335 (5th Cir.1994), *cert. denied*, 514 U.S. 1016, 115 S.Ct. 1358, 131 L.Ed.2d 215 (1995) ("*Ysleta I*") ("Texas law ... functions as surrogate federal law.") The reference in section 107(a) makes clear that "state law" encompasses both civil and criminal statutes. *See* 25 U.S.C. § 1300g–6(a). Al-

though federal courts maintain exclusive jurisdiction over cases involving violations of 107(a), congress empowered the State of Texas to sue in federal court to enforce the civil and criminal provisions through an injunction. *See* 25 U.S.C. § 1300g–6(c). (Fn.4)

(Fn.4) Moreover, other courts have determined that Congress is within its power in making state civil and criminal gambling laws applicable in Indian country. *See United States v. Santa Ynez Band of Chumash Mission Indians*, 983 F.Supp. 1317, 1324 (C.D.Cal.1997) (applying 18 U.S.C. § 1166(a) which incorporates state civil gambling provisions into federal law); *United States v. E.C. ·Investments, Inc.*, 77 F.3d 327, 331 (9th Cir. 1996) (addressing 18 U.S.C. § 1955 which does the same for criminal statutes).

The only other provision in the Restoration Act pertaining to gambling provides that "[nothing in the gambling] section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas." *See* 25 U.S.C. 1300g–6(b). (Fn.5)

(Fn.5) Section 1300g–6(b) appears to have been derived from two United States Supreme Court opinions. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Bryan v. Itasca Cty., Minnesota*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Although the Supreme Court in those cases determined that Public Law 280 (18 U.S.C. § 1162) did not grant to certain states general civil regulatory authority over tribal reservations, it also held that such authority could be granted where expressly provided by congress. *See Cabazon*, 480 U.S. at 214–15, 107 S.Ct. at 1091; *Bryan*, 426 U.S. at 383–85, 96 S.Ct. at 2108–09. These cases reinforce the notion that congress's grant to the State of Texas to exercise regulatory authority over gambling on the Tribe's reservation was valid. *See Cabazon*, 480 U.S. at 207, 107 S.Ct. at 1087 (discussing plenary powers of Congress over tribes).

Thus, the plain wording of sections 107(a) and (c) evince Congress's clear intent to limit the Tribe's sovereign immunity by allowing the State of Texas to enjoin reservation gambling using state anti-gaming laws. Accord *Ysleta I*, 36 F.3d 1327–29 (reviewing legislative history of Restoration Act); *Ysleta III*, 79 F.Supp.2d at 710 (rejecting sovereign immunity defense).

Undeniably, sections 125.021 and 125.022 of the Civil Practice Code are state laws pertaining to gambling. In addition, there is no issue here regarding the propriety of using an injunction to stop a criminal violation. Courts may enjoin a potential criminal violation only (1) in cases of national emergency; (2) in cases involving a public nuisance; or (3) in cases where a statute grants a court the power to enjoin a crime. *See United States v. Santee Sioux Tribe of Nebraska*, 135 F.3d 558, 565 (8th Cir.1998), *cert. denied*, 525 U.S. 813, 119 S.Ct. 48, 142 L.Ed.2d 37 (1998). In this case, there is (1) a statute defining as a public nuisance an establishment where state gambling laws are violated; and (2) federal and state statutes authorizing injunctions against state gambling law infractions. Furthermore, as the Eighth Circuit Court of Appeals has made clear, federal courts should employ state remedies (and hence state injunction procedures) to enforce "surrogate" federal gambling laws against tribes. *See Id.* (determining that where Nebraska case law provided for injunctive relief against violations of state gaming laws, federal court was required to enforce "surrogate" federal statute with reference to state law remedy).

\*　　\*　　\*　　\*　　\*　　\*

In this case, ... the AG is only using the Civil Practice Code provisions as they pertain to gambling. Under the Restoration Act, these provisions function as federal laws; they empower the AG, as the representative of the State of Texas, to bring a suit in federal court to enjoin gambling on the reservation. *See*

28 U.S.C. § 1300g–6(a) and (c). Consequently, the motion to dismiss under rules 12(b)(1) and 12(b)(6) should be denied.

### B. Lack of Capacity

Defendants' newest incarnation of its lack of capacity claim is premised on the notion that both state and federal law must explicitly empower the AG to bring suit on behalf of the State of Texas. This argument stems from Defendants' reading of *State of Texas v. Scott & Fetzer Co.,* a case concerning whether the AG was authorized under state law to bring a parens patriae action to recover for violations of federal antitrust law. *See* 709 F.2d 1024, 1024–25 (5th Cir. 1983).

\* \* \* \* \* \*

Defendants' contortion of *Scott & Fetzer* fails for several reasons .... [t]he Civil Practice Code authorizes the AG to sue anyone who runs a gambling casino within the state. Second, Defendants have cited no authority in support of the proposition that the state law allowing the AG to enjoin gambling must specifically refer to the Tribe or its reservation. The Restoration Act allows such suits, and only Congress can waive the Tribe's sovereign immunity; thus, there is no need for the State of Texas to also pass a statute authorizing suits against these particular Defendants. Similarly, the state is not obligated to amend its public nuisance statute specifically mention the federal cause of action; the restoration Act solves the problem by "federalizing" all state anti-gaming law. *See* 25 U.S.C. § 1300g–6(a). Accordingly, the motion to dismiss for lack of capacity should be denied.

The Court makes the following additional conclusions of law:

1. It accepts and adopts Judge Hudspeth's interpretation of the pertinent law as set forth in his opinions of December 3, 1999, and January 13, 2000, as quoted above.

■ 2. The Speaking Rock Casino is not a "Private Place" as defined by Texas Penal Code § 47.01(8) and the "social" gambling defense is unavailable unless the gambling is conducted on or at a place to which the public does not have access.

3. Any defenses stated in Texas Penal Code § 47.02(b); § 47.02(c) or § 47.029(e), 47.04(b), 47.05(b), 47.06(d), are as a matter of law inapplicable and unavailable to the Defendants in this civil case under the undisputed facts of this case.

4. Any defenses stated in Texas Penal Code § 47.09 and all of its provisions are as a matter of law inapplicable and unavailable to the Defendants in this civil case under the undisputed facts of this case.

5. None of the definitions, exemptions, or defenses set out in the Texas Penal Code provide Defendants with any authority to engage in any of the gaming activities they presently engage in on the Pueblo's reservation.

6. The Defendants' gaming activities on its reservation violate the Texas Penal Code and the Restoration Act, 25 U.S.C. § 1300g–1, et seq.

7. The evidence in this case has established, and the court so finds, that the Defendants in this case have embarked upon a long-continued habitual course of conduct clearly violative of the Gambling Laws of the State of Texas and that such parties, unless enjoined, will continue such habitual illegal activities at Speaking Rock Casino. More specifically, such Defendants, YSLETA DEL SUR PUEBLO, TIGUA GAMING AGENCY, THE TRIBAL COUNCIL, TRIBAL GOVERNOR ALBERT ALVIDREZ, TRIBAL LIEUTENANT GOVERNOR FILBERT CANDE-

LARIA, and GAMING COMMISSIONER FRANCISCO HERNANDEZ have habitually used, and threatened or contemplated the continued habitual use of, a place located in El Paso County, Texas known as, referred to and advertised as the Speaking Rock Casino, which is geographically a part of the Ysleta del Sur Pueblo Indian land and which has a street address of 122 S. Old Pueblo Rd., El Paso, Texas 79907 for the purpose of illegal gambling, gambling promotion and communicating gambling information prohibited by law by providing a place where Defendants charge and collect monetary fees from the public resulting in an economic benefit to them based upon patrons, guests and customers playing gambling games and betting money on games played with cards, dice and other gambling devices in violation of § 47 of the Texas Constitution; Chapter 47 of the Texas Penal Code; § 125.002 and § 125.021 of the Texas Civil Practice and Remedies Code and 25 U.S.C. § 1300–g–1 et seq. Ysleta Del Sur Pueblo Restoration Act.

■ 8. The operation of all games played with dice, cards, wheels, slot machines, KENO board, off track betting and BINGO cards at Speaking Rock Casino are violations of Texas Penal Code § 47.02 and constitute both a common and public nuisance under Texas Civil Practice and Remedies Code § 125.001 Common Nuisance and § 125.021 Public Nuisance.

■ 9. The State of Texas is entitled to the issuance of an injunction against the Defendants, their agents, employees, and attorneys pursuant to the Texas Civil Practice and Remedies Code § 125.002 and § 125.022 and Rule 65 of the Federal Rules of Civil Procedure requiring said Defendants to cease and desist from operating, conducting, engaging in or allowing others to conduct, operate or engage in gaming and gambling activities on the Pueblo's reservation held herein to be in violation of the Texas Penal Code and prohibited by the Restoration Act, 25 U.S.C. § 1300g–b. The Restoration Act makes it clear that the State of Texas may seek injunctive relief in federal courts to enforce the Act's gaming ban.

■ 10. Under the Restoration Act "tribal council members are not entitled to tribal sovereign immunity" because "tribal officials are not immune from suits for declaratory and injunctive relief," *Comstock Oil & Gas, Inc. v. Coushatta Indian Tribes of Texas*, No. 00–40088, 2001 WL 902139 (August 27, 2001) (citing *TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676–680 (5th Cir.1999)).

That the State of Texas, through its many prosecuting attorneys, may not have had a consistent and even handed approach to the enforcement of its gambling laws does not open the door to the Defendants to violate the State's Penal Code. Furthermore, this Court agrees with the State that the undisputed record does not sustain a claim by the Defendants of selective or discriminatory prosecution. The Court further notes this is a *civil* case. The State in seeking injunctive relief is not required in meet criminal law standards or to negate the exceptions or defenses referred to in the Penal Code.

■ The Defendants ask the Court to consider the "equities" and to refuse, in the exercise of its discretion, to enjoin the public and common nuisance the Tribe has created and is maintaining by its conduct of gaming activities in violation of chapter 47 of the Texas Penal Code and also the Restoration Act. The Tribe points to the beneficial impact of the Pueblo's operation on the Pueblo and upon the El Paso community. It quantifies that "positive impact" at in excess of $800,000,000. And the Court is told that unemployment has been reduced to zero among the members of the Pueblo and that over 780 persons,

including minorities, are employed in good paying jobs with significant benefits.

The Court recognizes that the Pueblo and its members, and others, have benefitted enormously from the Pueblo's illegal gambling operations, but this circumstance can not justify the clear violation of law. The fruits of this unlawful enterprise are tainted by the illegal means by which those benefits have been obtained.

Under the law the court believes it has no choice but to enjoin the continued operation of this widespread common and public nuisance. But, even assuming the court has some discretion in the matter, it concludes that it would be an abuse of that discretion not to enjoin the gaming and gambling activities under the circumstances of this case.

What the Defendants characterize as "equities" in this case are not such in the eyes of the law. They are matters which might, however, be brought to the attention of the Congress of the United States or the legislature of the State of Texas, for it is only through legislative change that the Defendants could possibly be permitted to carry on a casino operation of the type they presently conduct on the Pueblo's reservation. Of course, the Court expresses no view on the policy and political issues with which such legislative bodies would be called upon to deal if such legislative initiatives were pursued.

The persons and parties to be enjoined are each and every named Defendant and the officers, agents, servants, employees, and attorneys of each of said Defendants and also any independent contractors and/or consultants employed by, or retained by, any of the Defendants, their officers, agents, attorneys, servants or employees who receive who receive actual notice of this Court's Order and Injunction.

The persons and parties listed above will, by the Court's order and injunction, be required, *inter alia,* to, Cease, Desist, Terminate and Refrain From any involvement in any of the following activities at the Speaking Rock Casino and Entertainment Center or at any place on the Reservation of the Ysleta del Sur Pueblo or on any other property owned or controlled by said Pueblo, to-wit:

A. Gambling activities played with cards, dice, balls or any other gambling device where some, any or all of the persons and parties enjoined receive an economic benefit other than personal winnings. Specifically prohibited are all card games; all dice or die games; all games using one or more balls and a spinning wheel, (Roulette) and games involving a vertical spinning wheel, which require players to pay a monetary fee, which directly or indirectly benefits the Tribe, whether such fee is designated an "Ante," "Rake," Service Charge or otherwise.

B. Gambling activities played with cards, dice, balls or any other gambling device where some, any or all of the persons and parties enjoined, charge or collect or attempt to collect any monetary fee as a requirement for any person to bet on or play any game played with cards, dice, balls or any other gambling device, whether such fee is designated an "Ante," "Rake," Service Charge or otherwise.

C. Gambling activities played with cards, dice, balls or any other gambling device where some, any or all of the persons and parties enjoined act as the "house" or "banker" in the same fashion as the operator of a gambling casino and receive some economic benefit from so acting.

D. Providing to any person their usage a slot machine, the operation of

which is calculated to result in an economic benefit to the owner or lessor of the slot machine.

E. Conducting any gambling game from which any person or party enjoined herein is likely to receive any economic benefit other than personal winnings, including, but not limited to:

1. Bingo or any variation thereof;

2. Scratch tickets peel tickets, or pull tabs;

3. KENO or any variation thereof;

4. Tigua Dice, Craps or any variations thereof;

5. Slot Machines;

6. Poker card games;

7. Betting on horse races or dog races;

8. Tigua 21, Blackjack or any variations thereof;

9. Wheel of Fortune, Big Six Wheel, roulette or any variations thereof;

F. Allowing other persons or entities to engage in these enumerated activities on the premises of the Speaking Rock Casino.

### The Time Period for Total Compliance

The Court is not certain that it has the discretion to grant the Defendants a brief period within which to shut down their illegal operations in an orderly fashion. However, the Court notes that the State did not initiate this proceeding until 1999, some five plus years after the Defendants started engaging in casino type gambling. A "forthwith" order, if not clearly mandated, should not be used under the circumstances of this case, especially considering the number of people whose lives will be dramatically impacted by the Court's injunction. The Court will therefore grant the Defendants sixty (60) days within which to bring themselves into full and complete compliance with its injunction.

## ORDER MODIFYING SEPTEMBER 27, 2001, INJUNCTION

Before the Court is the Defendants' Motion for Clarification of Order Granting Summary Judgment and Injunction. The State has responded, and the Defendants have submitted a reply brief. After reviewing the submissions, the Court is prepared to rule. The Defendants' requests will be granted in part and denied in part, and the Court's September 27, 2001, Injunction will be modified accordingly.

### I. Factual and Procedural Background

The State of Texas filed this action against the Defendants on September 27, 1999, seeking to stop the operation of the Speaking Rock Casino and Entertainment Center (hereinafter "Casino") by the Ysleta Del Sur Pueblo Indian Tribe [1] (hereinafter "Tribe"). The Casino, located on the Tribe's reservation in El Paso County, Texas, opened in 1993 as a bingo hall, but subsequently expanded its gaming operations to include a wide variety of games of chance. The State sought to shut down the Casino as a nuisance in violation of the Texas Penal Code and the Restoration Act, 25 U.S.C. § 1300g.

The parties filed cross-motions for summary judgment. On September 27, 2001, the Court granted the State's motion and denied the Defendants' motion. The Court found that the Tribe "does not, as regards gambling, share a parallel sovereign status with the State of Texas," and shall be treated as any other private citizen or organization in regards to gaming questions. *See* 9/27/2001 Memorandum Opinion at 27. As such, the Court recognized that the Tribe is not prohibited from

---

1. The Ysleta Del Sur Pueblo Indian Tribe is also known as the Tigua Indian Tribe.

participating in all gaming activities, only those gaming activities that are prohibited to private citizens and organizations under Texas law. *See* 9/27/2001 Memorandum Opinion at 27–28. However, the Court noted that the Tribe had not attempted to qualify to participate in the permitted gaming activities:

> There are certain gaming activities that private citizens and/or certain organizations, such as charities, may engage in lawfully in Texas if they comply with those State rules, regulations, and licensing requirements that pertain to such gambling activities. The State has acknowledged that the Tribe, if it qualified under such rules and regulations and, if it complied with those established rules and regulations, could participate in such limited gaming activities. The problem here is that the Defendant Tribe has not even attempted to qualify under the rules, regulations or licensing requirements of the State of Texas with respect to any of the gaming activities

presently being conducted at the casino on its Reservation. And, since the [*California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987)] criminal and prohibitory civil-regulatory distinction does not apply under the Restoration Act with respect to gambling, the Tribe cannot engage in these "regulated" gaming activities unless it complies with the pertinent regulations.

9/27/2001 Memorandum Opinion at 28.

The Court concluded as a matter of law that the "Defendants' gaming activities on its reservation violate the Texas Penal Code and the Restoration Act." 9/27/2001 Memorandum Opinion at 37.[2] Finding the Casino to be a common and public nuisance under Texas law, the Court enjoined the Defendants from operating the Casino, having the practical and legal effect of prohibiting illegal as well as legal gaming activities by the Defendants. *See* 9/27/2001 Order Granting Summary Judgment and Injunction. Because the scope

---

**2.** The Court concluded as a matter of law:

7. The evidence in this case has established, and the Court so finds, that the Defendants in this case have embarked upon a long-continued habitual course of conduct clearly violative of the Gambling Laws of the State of Texas and that such parties, unless enjoined, will continue such habitual illegal activities at Speaking Rock Casino. More specifically, such Defendants, YSLETA DEL SUR PUEBLO, TIGUA GAMING AGENCY, THE TRIBAL COUNCIL, TRIBAL GOVERNOR ALBERT ALVIDREZ, TRIBAL LIEUTENANT GOVERNOR FILBERT CANDELARIA, and GAMING COMMISSIONER FRANSICO HERNANDEZ have habitually used, and threatened or contemplated the continued habitual use of a place located in El Paso County, Texas, known as, referred to and advertised as the Speaking Rock Casino, which is geographically a part of the Ysleta del Sur Pueblo Indian land and which has a street address of 122 S. Old Pueblo Rd.,

El Paso, Texas 79907 for the purpose of illegal gambling, gambling promotion and communicating gambling information prohibited by law by providing a place where Defendants charge and collect monetary fees from the public resulting in an economic benefit to them based upon patrons, guests and customers playing gambling games and betting money on games played with cards, dice and other gambling devices in violation of § 47 of the Texas Constitution; Chapter 47 of the Texas Penal Code; § 125.002 and § 125.021 of the Texas Civil Practice and Remedies Code; and 25 U.S.C. § 1300g–1 *et seq.*

8. The operation of all games played with dice, cards, wheels, slot machines, KENO boards, off track betting and BINGO cards at Speaking Rock Casino are violations of Texas Penal Code § 47.02 and constitute both a common and public nuisance under Texas Civil Practice and Remedies Code § 125.001 Common Nuisance and § 125.021 Public Nuisance.

9/27/2001 Memorandum Opinion at 37–38

of said injunction is presently at issue, the Court quotes its relevant terms:

### INJUNCTION

It is the Order of the Court, by this Injunction, that all such acts, activities, and conduct set forth above and also set forth below shall permanently CEASE, DESIST, and TERMINATE according to the time-table specified below.

### PERSONS AND PARTIES SUBJECT OF INJUNCTION

The Persons and Parties enjoined are as follows:

1. Ysleta del Sur Pueblo
2. Tigua Gaming Agency
3. The Tribal Council of the Ysleta del Sur Pueblo
4. Tribal Governor Albert Alvidrez
5. Tribal Lieutenant Governor Filbert Candelaria
6. Gaming Commissioner Francisco Hernandez
7. The officers, agents, servants, employees, and attorneys of the foregoing persons and parties.

### ACTIVITIES ENJOINED

The persons and parties enjoined and listed as being subject of injunction are hereby ORDERED to CEASE, DESIST, TERMINATE AND REFRAIN FROM engaging in, permitting, promoting, and conducting activities at the Speaking Rock Casino in violation of Chapter 47 of the Texas Penal Code, and 25 U.S.C. § 1300g of the Restoration Act, including but not limited to the following activities

A. Gambling activities played with cards, dice, balls, or any other gambling device where some, any or all of the persons and parties enjoined receive an economic benefit. Specifically prohibited are: all card games; all dice games; all games using one or more balls and or a spinning wheel; and games involving a vertical spinning wheel, which require players to pay a monetary fee, whether such fee is designated an "Ante," "Rake," Service Charge or otherwise.

B. Gambling activities played with cards, dice, balls, or any other gambling device some, any or all of the persons and parties enjoined charge or collect or attempt to collect any monetary fee as a requirement for any person to bet on or play any game played with cards, dice, ball or any other gambling device, whether such fee is designated by "Ante," "Rake," Service Charge or otherwise.

C. Gambling activities played with cards, dice, balls, Keno tickets, bingo cards, slot machines, or any other gambling device where some, any or all of the persons and parties enjoined act directly or indirectly as the "house" or "banker" in the same fashion as the operator of the gambling casino.

D. Providing to any person for his/her use a slot machine, the operation of which results in or is calculated to result in an economic benefit to the owner or lessor of the slot machine.

E. Conducting any gambling game from which any person or party enjoined herein is likely to receive any economic benefit other than personal winnings, including, but not limited to:

1. Bingo or any variation thereof;

2. Scratch tickets, peel tickets, or pull tabs;

3. Keno or any variation thereof;

4. Tigua Dice, Craps, or any variations thereof;

5. Slot Machines;

6. Poker card games;

7. Betting on horse races or dog races;

8. Tigua 21, Blackjack, or any variations thereof;

9. Wheel of Fortune, Big Six Wheel, or any variations of wheel games.

F. Allowing other persons or entities to engage in any of the above activities on the premises of the Speaking Rock Casino or anywhere upon the reservation lands of the Ysleta del Sur Pueblo or upon any other lands of said Tribe.

## TIME FOR COMPLETE COMPLIANCE

For the reasons set forth in its Memorandum Opinion of even date herewith, the Court gives the Defendants until November 30, 2001, within which to bring themselves into full and complete compliance with the Injunction set forth herein.

9/27/2001 Order Granting Summary Judgment and Injunction at 2–5.

On October 12, 2001, the Defendants filed a motion for reconsideration of the Court's grant of summary judgment.[3] The Defendants also asserted that the injunction is overly broad, in that it prohibits legal as well as illegal gambling activity on the reservation. On November 2, 2001, the Court denied the motion for reconsideration, concluding that the Defendants had presented nothing more than "a rehash of old arguments." In response to the broadness question, the Court recognized that the Tribe would eventually, if it qualified, "be permitted to engage in those gaming activities that any other citizen of Texas could lawfully engage in." 11/2/2001 Order at 3. However, as the deadline for compliance with the injunction had not passed, and the Defendants were not yet in compliance, the Court opted not to modify the injunction, even to allow legal activities, until the illegal gaming activities ceased. The Court provided that once in compliance, the Defendants could petition for a modification of the injunction that would permit participation in legal gaming activities. Specifically, the Court stated:

> The Court believes it is unnecessary, and, indeed, that it would be unwise, to change the injunction in anticipation of possible future actions by the defendants to engage in legal gambling on the Tribe's reservation. The Court has enjoined the defendants' operations as a common and public nuisance under Texas law for violating the Restoration Act. After the illegal operations cease and the nuisance is fully abated, the defendants are, of course, free to petition the Court for a modification of any of the terms of the injunction that they believe might limit their ability to participate in any legal gaming activity for which they have qualified under Texas law. As of the date of the injunction, and as of this date, the defendants have not, so far as the record reveals, taken any of the steps necessary to qualify.

11/2/2001 Order at 3–4.

The Defendants timely appealed the grant of summary judgment to the United States Court of Appeals for the Fifth Circuit. Pending the appeal, the Fifth Circuit granted the Defendants' motion to stay the injunction, and the Tribe continued operation of the Casino. On January 17, 2002,

---

**3.** The Defendants actually filed a Motion for New Trial and Motion to Amend Judgment. Because there had been no trial the motion was treated as a motion for reconsideration.

the Fifth Circuit affirmed this Court's decision. On February 12, 2002, this Court having received the Fifth Circuit's mandate, the Defendants complied with the injunction, ceasing operation of the Casino.

## II. Discussion

On March 1, 2002, the Defendants filed the instant motion. Styled as a motion for reconsideration, the Defendants seek a declaration that various proposed activities do not violate this Court's injunction. Furthermore, to the extent the injunction limits the Tribe's ability to participate in legal gaming activities for which they qualify under Texas law, the Defendants seek a modification of the injunction.

■ The State generally contends that the Defendants' motion should be denied as moot because, it argues, the injunction only enjoined illegal gaming activities by the Tribe, and not legal activities. Thus, the Tribe is not prevented from otherwise participating in legal gaming activities. The Court disagrees with the State's position. As noted, the legal and practical effect of the Court's injunction was to cease all gaming activities by the Defendants. Though the Court recognized that the Tribe would ultimately be permitted to participate in legal gaming activities under Texas law, if it so qualified, the Court determined that to ensure the illegal gaming activities ceased, all gaming activities should be enjoined on the reservation. Once in compliance, the Court provided that the Defendants could petition the Court for a modification of the injunction that would permit the Tribe to conduct legal gaming operations if it otherwise qualified under Texas law.

Therefore, the Court will consider the Defendants' request for declarations that various proposed activities do not violate the injunction, or, if an activity does violate the injunction and is a legal activity the Tribe is otherwise qualified to participate

in under Texas law, that the injunction be modified to permit said activity. The Defendants seek a review of the following proposed activities: (1) conducting state lottery activities as an agent of the State; (2) amusement devices; (3) carnival contests; (4) sweepstakes; (5) charitable bingo; (6) player pool activities; and (7) card games.

### A. State Lottery

■ The Tribe, as an agent of the State, conducts state lottery activities in the reservations' fuel stations. The Defendants seek a declaration that such activities are not in violation of the Court's injunction. The State contends that this is a legal gaming activity not prohibited by the injunction. As discussed above, the Court disagrees with the State's interpretation of the injunction. Because conducting state lottery activities on behalf of the State is a legal gaming activity the Tribe is otherwise qualified to participate in, the injunction will be modified to permit the Tribe to so conduct state lottery activities.

### B. Amusement Devices

■ The Defendants propose to operate various amusement devices, specifically: "electronic, electromechanical, and mechanical contrivances made and used solely for bona fide amusement purposes in compliance with Section 47.01(4)(B) of the Texas Penal Code." Gambling devices are illegal in Texas. Section 47.01(4) defines "gambling device":

(4) "Gambling device" means any electronic, electromechanical, or mechanical contrivance not excluded under Paragraph (B) that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill,

whether or not the prize is automatically paid by the contrivance. The term:

(A) includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electro-mechanical, or mechanical games, or facsimiles thereof, that operate by chance or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits; and

(B) *does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.*

Tex. Penal Code Ann. § 47.01(4) (emphasis added). The Tribe proposes to offer "amusement devices" within the gambling device prize exception provided by § 47.01(4)(B). It has adopted the quoted language from § 47.01(4)(B), but not the remainder of § 47.01(4), in a recently enacted Tribal ordinance. *See* Tribal Ordinance 003 (undated) at 2.01.

The State objects to this amusement device proposal because Tribal Ordinance 003 does not track the complete language of § 47.01(4), only the language from subsection (B). The Court concludes that this is not a basis to deny the Defendants' proposal. Whether Tribal Ordinance 003 contains the complete language of § 47.01(4) is immaterial; the Tribe is nevertheless bound by the Restoration Act to adhere to Texas state gambling law *in toto*. Merely because Tribal Ordinance 003 omits the complete language of § 47.01(4) does not mean that the Tribe may ignore pertinent state law. Furthermore, the Defendants assure the Court that the Tribe intends to abide by all the provisions of § 47.01(4) and otherwise operate within the gambling device prize exception. Therefore, the injunction will be modified to permit the Tribe to offer the proposed amusement devices, but only to the extent that the Tribe adheres to all the provisions of § 47.01(4), as well as other relevant Texas Penal Code sections.

The State also specifically objects to one particular gaming activity within the Defendants' amusement device proposal: "eight-liners." A Texas state court has described eight-liners as "video poker or video lottery machines." *See Owens v. State*, 19 S.W.3d 480, 481 (Tex.App.2000). Another court indicated that the machines "resemble slot machines." *See State v. One Super Cherry Master Video 8–Liner Machine*, 55 S.W.3d 51, 54 (Tex.App. 2001).[4] The State contends that all eight-liners are illegal in Texas. The Defendants disagree, contending that the Tribe's proposed use of eight-liners is legal in that it complies with the gambling device prize exception of § 47.01(4)(B). The Court agrees with the Defendants.

---

**4.** A witness testified in a Texas state court criminal case that "eight liners are electronic machines resembling slot machines and are commonly called eight liners because they can pay out in eight separate ways—three across, three down, and two diagonally. These machines operate by displaying a three-by-three grid of symbols or 'icons' with a winning combination being any three matching symbols in a line." *State v. Wofford*, 34 S.W.3d 671, 676 (Tex.App.2000).

As a threshold matter, the Court recognizes that eight-liners have been found to be "gambling devices" under § 47.01(4), and thus illegal. *See Allstar Amusement v. State,* 50 S.W.3d 705 (Tex.App.2001); *Hardy v. State,* 50 S.W.3d 689 (Tex.App. 2001). However, the eight-liners in these cases were found to be illegal in that they did not comport to the gambling device exception provided in § 47.01(4)(B). It is clear that if an eight-liner falls under the § 47.01(4)(B) exception, it is not illegal. The *Hardy* court recognized this, holding that eight-liners fall "within the exclusion provided by section 47.01(4)(B) only if it 'rewards the player exclusively with *noncash* merchandise, prizes, toys or novelties, or a representation of value redeemable for those items.'" *Hardy,* 50 S.W.3d at 697 (emphasis in original) (quoting Tex. Penal Code Ann. § 47.01(4)(B)). Other Texas courts have recognized that eight-liners are not illegal if they fall under the § 47.01(4)(B) exception. *See generally Legere v. State,* 82 S.W.3d 105, 113 n. 4 (Tex.App.—San Antonio 2002) ("Excluded from the definition are those devices that reward the player 'exclusively with noncash merchandises, prizes, toys or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.' As subsection 47.01(4)(B) exempts certain types of devices, not all eight-liners are necessarily gambling devices."); *One Super Cherry,* 55 S.W.3d at 53 ("Consequently, the State bore the additional burden of negating the applicability of section 47.01(4)(B) in order to prove that the eight liners were gambling devices within the meaning of the entire statute.").

The Court concludes that the Tribe shall be permitted to offer eight-liners as an amusement device, but only to the extent that it strictly adheres to the prize limitations provided in § 47.01(4)(B). That is, the device must exclusively offer "noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less." The Court cautions that the Tribe in offering amusement devices is to strictly adhere to this language, and the case law interpreting it.[5]

### C. Carnival Contests

The Defendants propose to participate in "carnival contests conducted at carnivals sponsored by qualified organizations, either as agent of the sponsor or as proprietor of the contest, as set forth in Section 47.01(1)(C) of the Texas Penal Code." Section 47.01(1)(C) provides:

(1) "Bet" means an agreement to win or lose something of value solely or partially by chance. A bet does not include: (C) an offer of merchandise, with a value not greater than $25, made by the proprietor of a bona fide carnival contest conducted at a carnival sponsored by a nonprofit religious, fraternal, school, law enforcement, youth, agricultural, or civic group, including any nonprofit agricultural or civic group incorporated by the state before 1955, if the person to receive the merchandise from the proprietor is the person who performs the carnival contest.

Tex. Penal Code Ann. § 47.01(1)(C). The Defendants note that the Tribe enacted a

---

**5.** The Court notes its view that gift certificates are *not* a noncash merchandise prize. *See* *Hardy,* 50 S.W.3d at 697.

tribal ordinance including the above-quoted language. *See* Tribal Ordinance 003 (undated) at 2.03.

The State objects to this proposal, contending that the Tribe cannot be categorized as one of groups permitted to participate in carnival activities. The Court agrees with the State. The Tribe is not a religious, school, law enforcement, youth, agricultural, or civic group. Furthermore, the record evidences no indication that the Tribe has taken steps to become a non-profit entity under Texas state law, *see generally* Tex. Civ. Stat. Art. 1396–1.01 *et seq.*, or otherwise qualifies as a fraternal group.

### D. Sweepstakes

■ The Defendants' sweepstakes proposal encompasses two pursuits: third-party giveaway contests conducted by national vendors and Tribal sweepstakes activities. The Court will first address the national vendors' contests.

According to the Defendants, the Tribe presently permits national third party vendors to conduct contests on the reservation. Contests conducted at Big Bear Lube Express Stores include:

(1) The Mobil 1 Advantage—receive a Mobil 1 Road Atlas / Travel Guide or Trip Maker CD with a purchase of Mobil 1 synthetic service;

(2) The Mobil 1 25th Anniversary Dream Lease Sweepstakes—register to win a two year lease on a Corvette / Mercedes–Benz / Porsche; and

(3) Mobil 1 Synthetic Service—replica NASCAR promotion

Contests conducted at Running Bear Stores:

(1) Nestles Crunch—win instantly a SUV or tickets to the 2002 NBA Finals;

(2) M & M's Crispy—win one of one million instant prizes;

(3) Corn Nuts—win a trip to Wrestle Mania;

(4) Kalil (7Up)—win instantly a home theater;

(5) Pepsi—win Final Four tickets;

(6) Doritos—win a home theater;

(7) Nestles Coca—win a ski vacation;

(8) Arm & Hammer Baking Soda—free CD with purchase/shipping;

(9) Cherrios—win a vacation;

(10) Coca–Cola—win a TV, Sony Playstation II, or Mini–Fridge; and

(11) Speedpass—win a vacation.

Though the record does not include specific information about each of these contests or giveaways, the Court will presume that they are of a type that are common at fuel stations and grocery stores across the country. For this reason, the injunction will be modified to permit these and other like-national third party vendor contests, provided that no specific contest violates Texas gaming law.[6] To the extent any such contest violates Texas gaming law, it continues to be prohibited by the injunction.

■ As for the Tribe itself, it proposes that it be permitted to "conduct sweepstakes activities in compliance with the provisions of Chapter 43 of the Texas Business and Commerce Code." The Tribe has enacted an ordinance adopting provisions of Chapter 43. *See* Tribal Ordinance 003 (undated).

The State acknowledges that "if the tribe operated a sweepstakes in compliance with Chapter 43 of the Texas Busi-

---

**6.** To the extent that these activities have taken place since February 12, 2002, the date of the Tribe's compliance with the injunction, the Court determines any violation of the injunction to be *de minimus*.

ness and Commerce Code and with the Texas Penal Code such activities would be legal, but the tribe has provided no facts to assess and determine whether its proposed 'sweepstakes' activities fit within the limits of Texas law." Furthermore, the State asserts that the Defendants provide no description of the proposed Tribal sweepstakes, nor any rules or regulations for such a proposal. Finally, the State notes that "it is difficult to imagine what activities the tribe envisions operating under the sweepstakes provisions. The relied-upon chapter sets out consumer protections and prohibitions for sweepstakes conducted *through the mail. See, e.g.,* Tex. Bus. & Comm.Code § 43.002."

The Defendants, in their reply brief, do not address these concerns and otherwise fail to apprise the Court of the type of sweepstakes it proposes. Without a specific proposal for a sweepstakes, legal under Texas law, before it, the Court will deny the Defendants' request to offer one. The Court will not modify the injunction to permit the Tribe to conduct a sweepstakes absent a firm and detailed proposal showing that said sweepstakes would be in compliance with Texas law.

### E. Charitable Bingo

■ Chapter 2001 of the Texas Occupations Code permits the performance of charitable bingo activities by qualified organizations and entities, and regulates the conduct of such activities in Texas. The Defendants propose that the Tribe be permitted to conduct charitable bingo activities, and the Tribe has adopted an ordinance the Defendants contend track the provisions of Chapter 2001. *See* Tribal Charitable Bingo Ordinance 002–02 (March 1, 2002).

Chapter 2001 provides, in part, that the Texas Lottery Commission (hereinafter "Commission") shall administer the provisions of Chapter 2001. *See* Tex. Occ.

Code Ann. § 2001.051(a). In order to participate in charitable bingo activities in Texas, an entity must apply for and receive a license from the Commission. *See* Tex. Occ.Code Ann. § 2001.101 *et seq.*

The Tribe has not applied for a license, and contends that they may conduct charitable bingo activities in Texas without such a license, provided this Court so modifies the injunction. The Defendants rely on Section 107(b) of the Restoration Act, codified at 25 U.S.C. § 1300g–6(b), to contend that the Tribe is not subject to the regulatory jurisdiction of the State of Texas. Because the Tribe is not subject to the regulatory jurisdiction of Texas, they need not seek a license from the Commission or adhere to the other administrative provisions of state law to participate in charitable bingo activities.

■ The Court notes that while the Restoration Act provides that the Tribe is subject to Texas gaming law, the Act does not provide Texas any regulatory jurisdiction over the Tribe:

(a) All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservations and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.–C.–02–86 which was approved and certified on March 12, 1986.

(b) *Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.*

25 U.S.C. § 1300g–6(a)–(b) (emphasis added).

The State objects to the Tribe's charitable bingo proposal, contending that the Tribal ordinance does not fully track Chapter 2001. For instance, the ordinance provides: the Tribe holds the exclusive authority to operate and regulate charitable bingo activities on the Tribe; the Tribe, not the Commission, will act as the governing, auditing, and taxing agency for charitable bingo activities; and "charitable purpose" is defined in relation to benefits for the Tribe. The State further asserts:

The decision of this Court and the 1994 and 2002 decisions of the Fifth Circuit made clear that under the Restoration Act, Texas law defines the legality of any gambling activities by the tribe. The tribe is proposing that it operate bingo not according to Texas law, but according to its own ordinance. That suggestion flies in the face of decisional law that, by way of the Restoration Act's adoption of Texas law as surrogate federal law, the legality of any gambling activities are defined by *Texas* law.

The Court notes that the Tribe waived any parallel sovereign status, as regards gaming questions, that it might have when it made its compact with Texas in order to obtain federal trust status. The Tribe is bound, through the terms of the Restoration Act, to adhere to Texas gaming law. Not all gaming activities are prohibited to the Tribe, only those gaming activities that are prohibited by Texas law to private citizens and other organizations. As such, the Tribe may participate in legal gaming activities. However, because of the scope and nature of the Tribe's violation of the Texas Penal Code, the Court's September 27, 2001, injunction enjoined all gaming activities on the Tribe, whether legal or illegal. The Court provided that once the Tribe complied with the terms of the injunction and ceased their gaming operations, it could petition the Court for a modification of the injunction to permit it to participate in legal gaming activities, provided that the Tribe *otherwise qualified* to participate in said activities. The Court further recognizes that Section 107(b) of the Restoration Act provides that Texas does not hold regulatory jurisdiction over the Tribe.

Though a close question, the Court concludes that, pursuant to its September 27, 2001, Memorandum Opinion, the Defendants have not shown that the Tribe is "otherwise qualified" to participate in charitable bingo activities under Texas law. While the Tribe is not subject to the regulatory jurisdiction of the State, including the Commission, it is clear that the Tribe is subject to Texas law on all gaming matters, including participation in charitable bingo activities. To make the otherwise qualified showing, and to ensure that its charitable bingo proposal is not in violation of the Texas Penal Code, the Court concludes that the Tribe should be required to procure a license from the Commission. Only upon making this otherwise qualified showing, and proper motion to this Court, will the Court consider modifying the injunction to permit charitable bingo activities by the Tribe.

The Court's determination does not mean that the Tribe is subject to the regulatory jurisdiction of the Commission. It is not. Upon the Tribe's otherwise qualified showing, and modification of the injunction, the Tribe's charitable bingo activities would not be subject to the Commission's regulatory scheme. Nevertheless, the Tribe would still be bound by the Restoration Act to adhere to the Texas Penal Code and other relevant law in regards to gaming issues. If the Tribe's charitable bingo activities ever violated relevant Texas law, the State would be free under the terms of the Restoration Act to seek appropriate relief in a federal forum.

### F. Player Pool Activities and Card Games

The Defendants propose that the Tribe be permitted to conduct "drawings and tournaments" in which "Player Pool members" compete for "Player Pool funds." Specifically, the Defendants propose:

to conduct free promotional activities such as drawings and tournaments in which the Player Pool members may compete for the funds remaining in the Player Pool fund in which the Tribe does not charge any fee or require any other compensation on the part of the players. The winners of the games will receive various prize amounts from the Player Pool fund. The promotional activities will be conducted on the Tribe's reservation at no cost or charge to Player Pool members. The promotional activities will continue until the funds remaining in the Player Pool have been disbursed to Player Pool members through such promotional activities.

The Tribe has adopted a Tribal resolution "authorizing" such activities. *See* Tribal Resolution TC–17–02 (Feb. 26, 2002). The resolution provides:

Player Pool permits players to play against each other as opposed to playing against a banker. Except for the advantage of skill or luck, the risks of losing and the chance of winning are the same for all players. Assets accumulated in the pool are maintained to provide prizes in which all players shall have an opportunity to participate. The pool shall consist of cash and non-cash prizes. If a prize other than cash is offered, it must be acquired by the pool at fair market value and not in excess thereof. The rules and regulations of Player Pool shall be made available to all players. Player Pool funds shall be held in separate non-interest bearing bank accounts, and when deposited shall not be commingled with any funds of the Enter-

prise or Pueblo. The Enterprise shall provide an accounting of pool wins, losses, and contributions for each day of operation. The accounting shall be completed as soon as practicable after the close of each day in accordance with the Enterprise operations. As a result of the accounting, adjustments for each day will be made between the pool and the Enterprise. Those adjustments are not contributions. The holding of daily receipts, including the sale of chips, pending distributions, is not commingling of funds. The Pueblo may, from time to time, disburse funds to Player Pools as a non-obligated contribution and shall have no right to recoup same. If for any reason a Player Pool game with assets in the pool ceases to be played, all assets remaining on hand in that pool shall be distributed to Player Pool members through promotional events conducted by the Pueblo, at the discretion of the Pueblo.

Tribal Resolution TC–17–02 (Feb. 26, 2002) at 1.

 The Defendants also propose that the Tribe be permitted to conduct "promotional activities in which participants will play card games, in which the players compete for various prizes offered by the Tribe, at no charge to the players or participants in the promotional activities. The Tribe will realize no economic benefit or fee from the conducting of the activities or the play of such activities by participants."

The State opposes the two proposals. The State concedes that the Tribe will not charge any fee for participating in the Player Pool or card games, but contends that the Tribe may still charge admission or membership fees or collect other monies under both proposals. The resolution also provides that "adjustments" would be made between the Player Pool and the Tribe. Thus, the proposals are just as

illegal under the Texas Penal Code as past Tribe activities, no matter that players compete "against each other as opposed to playing against a banker." But even if the Tribe received no consideration from the players, the Tribe would not qualify under Texas law to permit this activity within the Casino because the Court specifically found that the Casino is not a "private place" under Tex. Penal Code Ann. § 47.02(b). *See* 9/27/2001 Memorandum Opinion at 30.

The Court agrees with the State that the injunction should not be modified to permit the "Player Pool" and card game proposals. The proposed activities are closely akin to .the activities offered by the Casino prior to the injunction, and the Court is not satisfied on the present record that the proposed activities are, in fact, legal under state gambling laws. The Court envisions various ways in which the Tribe can realize consideration for the individuals participating in the proposed gaming activities. Furthermore, the Court is unsure what the Tribal resolution means by the "adjustments" made between the Player Pool and the Tribe. Finally, the Court continues to conclude that the Tribe's Casino is not a "private place" under Tex. Penal Code Ann. § 47.02(b). All this, coupled with the State's opinion that the proposed activities are illegal, leads the Court to conclude that the injunction will not be modified to permit the Player Pool and card game activities.

## III. Conclusion

IT IS THEREFORE ORDERED that the requests made in the Defendants' Motion for Clarification of Order Granting Summary Judgment and Injunction[7] be, and are hereby, GRANTED in part and DENIED in part.

7. Doc. No. 160.

IT IS FURTHER ORDERED that the Court's September 27, 2001, Injunction be, and it is hereby, MODIFIED to permit the Tribe to participate in the following activities as provided herein:

1. State lottery activities as an agent of the State of Texas;

2. Amusement devices, but only to the extent the Tribe adheres to all the provisions of Tex. Penal Code Ann. § 47.01(4) and other relevant Texas law; and

3. Third-party giveaway contests conducted by national vendors.

## *ORDER*

Before the Court is the State of Texas' Motion for Reconsideration of the Court's Order Modifying September 27, 2001 Injunction. The Defendant has responded, and the Court is prepared to rule. For the reasons provided herein, the State's motion will be denied.

## I. Factual and Procedural Background

The State of Texas filed this action against the Defendants on September 27, 1999, seeking to stop the operation of the Speaking Rock Casino and Entertainment Center (hereinafter "Casino") by the Ysleta Del Sur Pueblo Indian Tribe[1] (hereinafter "Tribe"). The Casino, located on the Tribe's reservation in El Paso County, Texas, opened in 1993 as a bingo hall, but subsequently expanded its gaming operations to include a wide variety of games of chance. The State sought to shut down the Casino as a nuisance in violation of the Texas Penal Code and the Restoration Act, 25 U.S.C. § 1300g.

The parties filed cross-motions for summary judgment. On September 27, 2001, the Court granted the State's motion and denied the Defendants' motion. The

1. The Ysleta Del Sur Pueblo Indian Tribe is also known as the Tigua Indian Tribe.

Court found that the Tribe "does not, as regards gambling, share a parallel sovereign status with the State of Texas," and shall be treated as any other private citizen or organization in regards to gaming questions. *See* 9/27/2001 Memorandum Opinion at 27. As such, the Court recognized that the Tribe is not prohibited from participating in all gaming activities, only those gaming activities that are prohibited to private citizens and organizations under Texas law. *See* 9/27/2001 Memorandum Opinion at 27–28. However, the Court noted that the Tribe had not attempted to qualify to participate in the permitted gaming activities:

> There are certain gaming activities that private citizens and/or certain organizations, such as charities, may engage in lawfully in Texas if they comply with those State rules, regulations, and licensing requirements that pertain to such gambling activities. The State has acknowledged that the Tribe, if it qualified under such rules and regulations and, if it complied with those established rules and regulations, could participate in such limited gaming activities. The problem here is that the Defendant Tribe has not even attempted to qualify under the rules, regulations or licensing requirements of the State of Texas with respect to any of the gaming activities presently being conducted at the casino on its Reservation. And, since the [*California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987)] criminal and prohibitory civil-regulatory distinction does not apply under the Restoration Act with respect to gambling, the Tribe cannot engage in these "regulated" gaming activities unless it complies with the pertinent regulations.

9/27/2001 Memorandum Opinion at 28.

The Court concluded as a matter of law that the "Defendants' gaming activities on its reservation violate the Texas Penal Code and the Restoration Act." 9/27/2001 Memorandum Opinion at 37.[2] Finding the

2. The Court concluded as a matter of law:

> 7. The evidence in this case has established, and the Court so finds, that the Defendants in this case have embarked upon a long-continued habitual course of conduct clearly violative of the Gambling Laws of the State of Texas and that such parties, unless enjoined, will continue such habitual illegal activities at Speaking Rock Casino. More specifically, such Defendants, YSLETA DEL SUR PUEBLO, TIGUA GAMING AGENCY, THE TRIBAL COUNCIL, TRIBAL GOVERNOR ALBERT ALVIDREZ, TRIBAL LIEUTENANT GOVERNOR FILBERT CANDELARIA, and GAMING COMMISSIONER FRANSICO HERNANDEZ have habitually used, and threatened or contemplated the continued habitual use of a place located in El Paso County, Texas, known as, referred to and advertised as the Speaking Rock Casino, which is geographically a part of the Ysleta del Sur Pueblo Indian land and which has a street address of 122 S. Old Pueblo Rd.,

> El Paso, Texas 79907 for the purpose of illegal gambling, gambling promotion and communicating gambling information prohibited by law by providing a place where Defendants charge and collect monetary fees from the public resulting in an economic benefit to them based upon patrons, guests and customers playing gambling games and betting money on games played with cards, dice and other gambling devices in violation of § 47 of the Texas Constitution; Chapter 47 of the Texas Penal Code; § 125.002 and § 125.021 of the Texas Civil Practice and Remedies Code; and 25 U.S.C. § 1300g–1 *et seq.*

> 8. The operation of all games played with dice, cards, wheels, slot machines, KENO boards, off track betting and BINGO cards at Speaking Rock Casino are violations of Texas Penal Code § 47.02 and constitute both a common and public nuisance under Texas Civil Practice and Remedies Code § 125.001 Common Nuisance and § 125.021 Public Nuisance.

9/27/2001 Memorandum Opinion at 37–38.

Casino to be a common and public nuisance under Texas law, the Court enjoined the Defendants from operating the Casino, having the practical and legal effect of prohibiting illegal as well as legal gaming activities by the Defendants. *See* 9/27/2001 Order Granting Summary Judgment and Injunction. *See* 9/27/2001 Order Granting Summary Judgment and Injunction at 2–5.

On October 12, 2001, the Defendants filed a motion for reconsideration of the Court's grant of summary judgment.[3] The Defendants also asserted that the injunction is overly broad, in that it prohibits legal as well as illegal gambling activity on the reservation. On November 2, 2001, the Court denied the motion for reconsideration, concluding that the Defendants had presented nothing more than "a rehash of old arguments." In response to the broadness question, the Court recognized that the Tribe would eventually, if it qualified, "be permitted to engage in those gaming activities that any other citizen of Texas could lawfully engage in." 11/2/2001 Order at 3. However, as the deadline for compliance with the injunction had not passed, and the Defendants were not yet in compliance, the Court opted not to modify the injunction, even to allow legal activities, until the illegal gaming activities ceased. The Court provided that once in compliance, the Defendants could petition for a modification of the injunction that would permit participation in legal gaming activities. Specifically, the Court stated:

> The Court believes it is unnecessary, and, indeed, that it would be unwise, to change the injunction in anticipation of possible future actions by the defendants to engage in legal gambling on the Tribe's reservation. The Court has enjoined the defendants' operations as a common and public nuisance under Tex-

as law for violating the Restoration Act. After the illegal operations cease and the nuisance is fully abated, the defendants are, of course, free to petition the Court for a modification of any of the terms of the injunction that they believe might limit their ability to participate in any legal gaming activity for which they have qualified under Texas law. As of the date of the injunction, and as of this date, the defendants have not, so far as the record reveals, taken any of the steps necessary to qualify.

11/2/2001 Order at 3–4.

The Defendants timely appealed the grant of summary judgment to the United States Court of Appeals for the Fifth Circuit. Pending the appeal, the Fifth Circuit granted the Defendants' motion to stay the injunction, and the Tribe continued operation of the Casino. On January 17, 2002, the Fifth Circuit affirmed this Court's decision. On February 12, 2002, this Court having received the Fifth Circuit's mandate, the Defendants complied with the injunction, ceasing operation of the Casino.

On March 1, 2002, the Defendants filed a motion seeking a declaration that various proposed activities do not violate this Court's injunction. In the alternative, to the extent the injunction limits the Tribe's ability to participate in legal gaming activities for which they qualify under Texas law, the Defendants sought a modification of the injunction.

On May 14, 2002, the Court granted in part and denied in part the Defendants' motion. The Court observed that its September 27, 2001, Injunction banned the Defendants from conducting all gaming activities on the Tribe, whether legal or illegal under Texas law. Once the Defendants complied with said Injunction, they

---

**3.** The Defendants actually filed a Motion for New Trial and Motion to Amend Judgment. Because there had been no trial the motion was treated as a motion for reconsideration.

could then petition the Court to modify it to permit them to participate in gaming activities that any other citizen of Texas could lawfully engage in. The Court thus considered the merits of the Defendants' requests, and concluded, in part, that the Tribe could offer certain amusement devices, including "eight-liners," if it adhered to the gambling device exception in § 47.01(4)(B) of the Texas Penal Code. Specifically, the Court held:

> The Defendants propose to operate various amusement devices, specifically: "electronic, electromechanical, and mechanical contrivances made and used solely for bona fide amusement purposes in compliance with Section 47.01(4)(B) of the Texas Penal Code." Gambling devices are illegal in Texas. Section 47.01(4) defines "gambling device":
>
> > (4) "Gambling device" means any electronic, electromechanical, or mechanical contrivance not excluded under Paragraph (B) that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance. The term:
> >
> > (A) includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electromechanical, or mechanical games, or facsimiles thereof, that operate by chance or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits; and
> >
> > (B) *does not include any electronic, electromechanical, or mechanical*

> *contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.*

Tex. Penal Code Ann. § 47.01(4) (emphasis added). The Tribe proposes to offer "amusement devices" within the gambling device prize exception provided by § 47.01(4)(B)....

[T]he Defendants assure the Court that the Tribe intends to abide by all the provisions of § 47.01(4) and otherwise operate within the gambling device prize exception. Therefore, the injunction will be modified to permit the Tribe to offer the proposed amusement devices, but only to the extent that the Tribe adheres to all the provisions of § 47.01(4), as well as other relevant Texas Penal Code sections.

The State also specifically objects to one particular gaming activity within the Defendants' amusement device proposal: "eight-liners." A Texas state court has described eight-liners as "video poker or video lottery machines." *See Owens v. State,* 19 S.W.3d 480, 481 (Tex.App. 2000). Another court indicated that the machines "resemble slot machines." *See State v. One Super Cherry Master Video 8–Liner Machine,* 55 S.W.3d 51, 54 (Tex. App.2001). The State contends that all eight-liners are illegal in Texas. The Defendants disagree, contending that the Tribe's proposed use of eight-liners is legal in that it complies with the gambling device prize exception of

§ 47.01(4)(B). The Court agrees with the Defendants.

As a threshold matter, the Court recognizes that eight-liners have been found to be "gambling devices" under § 47.01(4), and thus illegal. *See Allstar Amusement v. State,* 50 S.W.3d 705 (Tex.App.2001); *Hardy v. State,* 50 S.W.3d 689 (Tex.App.2001). However, the eight-liners in these cases were found to be illegal in that they did not comport to the gambling device exception provided in § 47.01(4)(B). *It is clear that if an eight-liner falls under the § 47.01(4)(B) exception, it is not illegal.* The *Hardy* court recognized this, holding that eight-liners fall "within the exclusion provided by section 47.01(4)(B) only if it 'rewards the player exclusively with *noncash* merchandise, prizes, toys or novelties, or a representation of value redeemable for those items.'" *Hardy,* 50 S.W.3d at 697 (emphasis in original) (quoting Tex. Penal Code Ann. § 47.01(4)(B)). Other Texas courts have recognized that eight-liners are not illegal if they fall under the § 47.01(4)(B) exception. *See generally Legere v. State,* 82 S.W.3d 105, 2002 WL 560963, n. 4 (Tex.App.2002) ("Excluded from the definition are those devices that reward the player 'exclusively with noncash merchandises, prizes, toys or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.' As subsection 47.01(4)(B) exempts certain types of devices, not all eight-liners are necessarily gambling devices."); *One Super Cherry,* 55 S.W.3d at 53 ("Consequently, the State bore the additional burden of negating the applicability of section 47.01(4)(B) in order to prove that the eight liners were gambling devices within the meaning of the entire statute.").

The Court concludes that the Tribe shall be permitted to offer eight-liners as an amusement device, but only to the extent that it strictly adheres to the prize limitations provided in § 47.01(4)(B). That is, the device must exclusively offer "noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less." The Court cautions that the Tribe in offering amusement devices is to strictly adhere to this language, and the case law interpreting it.

5/14/2001 Order Modifying September 11, 2001, Injunction at 8–11 (emphasis added) (citations omitted).

## II. Discussion

■■■ The State requests that the Court reconsider its modification of the September 27, 2001, Injunction whereby it permitted the Defendants to offer amusement devices, including eight-liners, within the gambling device exception of § 47.01(4)(B). The State notes that the Supreme Court of Texas has recently granted review of two Texas Court of Appeals decisions, *Hardy* and *One Super Cherry,* cited by this Court in its May 14, 2002, Order. The State generally contends that this Court should not permit the Tribe to offer eight-liners until the Supreme Court issues its decisions in *Hardy* and *One Super Cherry.* The Court disagrees.

The Court did not rely on *Hardy* and *One Super Cherry* so much as a plain reading of § 47.01(4)(B). The statute clearly provides a gambling device exception. The Court's Orders of September

714

27, 2001, and May 14, 2002, concluded that the Tribe may, under the terms of the Rehabilitation Act, participate in gaming activities that any other citizen of Texas can lawfully engage in, provided they make an "otherwise qualified" showing. This Court, after reviewing Texas statutory and case law, determined that citizens of Texas may lawfully offer eight-liners, provided they adhere to the prize limitations of § 47.01(4)(B). Because under the Rehabilitation Act the Tribe is to be treated, as regards gambling, like any other private citizen or organization, they should not be deprived of the right to participate in a legal gaming activity merely because the *Hardy* and *One Super Cherry* cases are being appealed. Nevertheless, if the Supreme Court of Texas decides that eight-liners are illegal *per se*, or if the Texas Legislature changes the gambling device exception, the State is free to petition the Court to modify the terms of the Injunction.

## III. Conclusion

IT IS THEREFORE ORDERED that the State of Texas' Motion for Reconsideration of the Court's Order Modifying September 27, 2001 Injunction[4] be, and it is hereby, DENIED.

4. Doc. No. 166.